**Gladys MARNEEF and Henry Marneef, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 78–73248.**

United States District Court, E. D. Michigan, S. D.

Dec. 30, 1981.

Daniel D. Phelan, Bloomfield Hills, Mich., for plaintiffs.

Pamela J. Thompson, Asst. U. S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PATRICIA J. BOYLE, District Judge.

Plaintiffs, Henry and Gladys Marneef, bring this action under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, seeking damages allegedly resulting from Mrs. Marneef's receipt of a swine flu inoculation during the immunization program undertaken by the federal government in the National Swine Flu Immunization Program of 1976, Pub.L. 94–380, 90 Stat. 1113 (1976) (amended 1978) [hereinafter Swine Flu Act or Act]. Specifically, Mrs. Marneef contends that she contracted either Guillain-Barre Syndrome (hereinafter GBS) or a peripheral neuropathy as a result of the vaccine. Plaintiffs also contend that Defendant negligently failed to warn and gave inadequate warnings of the risks of swine flu vaccination and that the Government failed to develop adequate justification for the program and failed adequately to test the vaccine before administering it to the public.

Defendant contends that Plaintiff Gladys Marneef did not develop GBS, that there is no causal connection between the vaccine and the condition which Plaintiff developed, and that Plaintiffs have failed to prove that the Defendant negligently failed to warn or gave inadequate warnings.

The case was filed on December 29, 1978, transferred as multi-district litigation (MDL) to the District of Columbia for consolidated pretrial proceedings, and remanded to this Court by an order dated January 11, 1980.

■ Having considered the evidence, briefs, and arguments of the parties and having concluded that Plaintiff Gladys Marneef has failed to show that her condition was caused by the swine flu inoculation, I find that Plaintiffs are not entitled to recovery. The following constitute findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The Swine Flu Immunization Program of 1976 was a governmentally-undertaken attempt to inoculate the entire population, prompted by the discovery at Fort Dix, New Jersey, of individuals having influenza of the "swine" type and the resulting concern that an epidemic would occur. The Act directed the establishment of a national swine flu immunization program and in pertinent part provided the following:

(1) The Act created a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu innoculation resulting from the act or omission of the program participant upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty. 42 U.S.C. § 247b(k)(2)(A) (amended 1978).

(2) The Swine Flu Act made the above cause of action the exclusive remedy and abolished any causes of action against the vaccine manufacturer by individual claimants. 42 U.S.C. § 247b(k)(3) (amended 1978).

(3) It made the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act. 42 U.S.C. § 247b(k)(4) (amended 1978).

(4) The Act directed the development and implementation of a written informed consent form and procedures for as- suring that the risks and benefits from the swine flu vaccine are fully explained. 42 U.S.C. § 247b(j)(1) (amended 1978).

Vaccinations began on October 16, 1976, and the program was suspended on December 16, 1976, following reports of a number of participants developing GBS within a ten-week period after inoculation.

Under the terms of the final pretrial order, if Plaintiffs establish that Mrs. Marneef contracted GBS, they need not establish any theory of liability. However, if she did not contract GBS, then they must prove negligence or another appropriate theory of liability.

On November 17, 1976, Mrs. Marneef, then approximately forty-five years old, received a swine flu inoculation at Huntington Woods Recreation Center in Huntington Woods. Prior to this date, Mrs. Marneef was in good physical health. Approximately one month to five weeks later Plaintiff noticed numbness in her fingertips and within one to three days numbness in her bottom lip and her toes. During the next two weeks, the numbness progressed, moving from her fingers up to her wrists, from her toes up to her ankle, and from her lower lip up to her nose. During this period of time, Mr. and Mrs. Marneef were in Scotland visiting her ailing mother. By the time Mrs. Marneef returned home, she had numbness of the hands, feet, and lower half of her face. She had no feeling in her throat or her tongue.

On January 8, 1977, Plaintiff went to see Meyer Gutterman, M.D., an internist. After a brief examination, Dr. Gutterman's impression was that Plaintiff was having "nervous symptoms." (Gutterman Dep. at 16.) He performed a more extensive examination on January 14, 1977. Neurological findings were negative, and Dr. Gutterman's impression was that Plaintiff had a toxic neuropathy. A subsequent examination on January 27, 1977, showed brisk reflexes in the upper limbs (Dep. at 41). On February 17, 1977, a spinal fluid examination showed an abnormal spinal fluid pro-

tein of 96 milligrams percent (Dep. at 23). At this time Dr. Gutterman learned that Plaintiff had had the flu vaccine, and based on the elevated spinal fluid protein and the temporal relationship between receipt of the shot and onset of symptoms (Dep. at 47), the doctor concluded that Mrs. Marneef had a mild GBS syndrome. Dr. Gutterman acknowledged that Plaintiff's sensory symptoms were more severe than her motor symptoms (Dep. at 43) and stated that in a case of mild GBS areflexia (absence of reflexes) was not required for diagnosis. He testified that Mrs. Marneef was the third patient he had treated for GBS in the course of his professional life (Dep. at 46).

Plaintiff was also examined by Dr. Joseph Chandler, a board certified neurologist, to whom she was referred by Dr. Gutterman. Dr. Chandler, Chief of Neurology at both Sinai and Providence Hospitals, examined Plaintiff on February 4, 1977, and concluded that she was not suffering from GBS, and that her illness was a peripheral neuropathy (Dep. at 19). His opinion was based on a finding of loss of taste, the fact that sensory loss was greater than motor weakness (no muscle weakness other than some mild weakness in her hands), and the presence of reflexes. Dr. Chandler testified that the elevated spinal fluid protein later found by Dr. Gutterman did not change his opinion because the presence of red blood cells in the fluid, in his opinion, indicated trauma to a blood vessel during testing with consequent leaking of blood and protein in the spinal space (Dep. at 21–22). Dr. Chandler did indicate that there was a "possibility" raised from being advised that Plaintiff had a swine flu vaccination in mid-November, 1976, that Mrs. Marneef had GBS (Dep. at 23).

Dr. Gutterman testified that Mrs. Marneef started to improve in mid-January, 1977, and by April, 1977, had made a complete recovery.

Defendant also presented the testimony of Doctors Zafar Mahmud and John Gilroy.

Mr. Mahmud, a board certified neurologist, Director of Neuro-muscular Disease at Harper-Grace Hospital, performed an electrophysiologic examination of Plaintiff on September 18, 1980. Dr. Mahmud defined "neuropathy" as a disorder of the nerves. He defined "peripheral neuropathy" as a neuropathy affecting the peripheral nervous system, a "polyneuropathy" as a disorder affecting many nerves, "radiculo neuropathy" as a neuropathy affecting the proximate or large muscles. He testified that GBS is a polyradiculoneuropathy of a demyelinating type in which the sheath or myelin of the nerve degenerates. It was Dr. Mahmud's opinion that Mrs. Marneef had a peripheral neuropathy of axonal type involving (the axon or core of the nerve) as opposed to a demyelinating neuropathy (such as GBS).

Dr. Gilroy testified that, based on his examination of Mrs. Marneef, the history she gave, the reports of Doctors Gutterman and Chandler and Dr. Mahmud's electrophysiologic examination results, he was also of the opinion that Plaintiff did not have GBS but rather had a peripheral neuropathy of the axonal type. He testified that Mrs. Marneef suffered from a primarily sensory neuropathy and a diagnosis of GBS was contraindicated because of the time interval between Mrs. Marneef's sensory symptoms and the numbness in her hands and feet, as distinct from GBS in which any sensory symptoms are rapidly followed by proximal muscle weakness. Dr. Gilroy also testified that a patient who has a motor neuropathy has an absence of reflexes, which "very often" are never restored, that the fact Mrs. Marneef's reflexes were "very brisk" was also highly inconsistent with GBS, and that the absence of taste was also inconsistent with GBS.

Dr. Gilroy also relied on the NINCDS [1] criteria for diagnosis of GBS. These criteria, which he testified are the generally accepted diagnostic criteria, require for diagnosis of GBS both progressive motor weakness of more than one limb and areflexia (loss of tendon jerks) (Government Exhibit 50). Dr. Gilroy testified that Mrs.

1. National Institute of Neurological Communi-    cative Disorders and Stroke.

Marneef lacked both of these symptoms and that she also lacked almost all the "features strongly supportive of the diagnosis" (Exhibit 50). Dr. Gilroy testified that, in his opinion, the vaccine did not cause Plaintiff's peripheral neuropathy. He thought it more likely that the cause of Plaintiff's condition was Blanket Wash ET–2144, a petroleum hydrocarbon, which he testified he understood Mrs. Marneef had been using in the course of her employment.

GBS is a neurological disorder which affects the peripheral, as opposed to the central, nervous system. The term describes a set of symptoms recognized as a type of neuropathy. Its cause is unknown.

While it is clear that there is disagreement among the experts both with regard to applicability of certain criteria and the inflexibility with which they should be applied (Poser Dep. at 32–39), the weight of medical evidence agrees that GBS shows the following characteristics: it affects the peripheral nervous system, it is a progressive motor weakness, manifested symmetrically or laterally with reflex impairment, sensory involvement is less prominent than motor symptoms, and elevated protein levels in the cerebrospinal fluid clinically support the diagnosis (Arnason Dep. at 40). Features required for diagnosis within the NINCDS guidelines are progressive motor weakness of more than one limb and areflexia. Although Plaintiff submits that the depositions of Doctors Arnason and Schaumburg permit the conclusion that "occasionally sensory loss may predominate over motor loss" (Plaintiff's Trial Brief at 20), in my view both doctors agree that motor symptoms predominate over sensory symptoms (Arnason Dep. at 24, Schaumburg Dep. at 12). By MDL deposition, Dr. Peter Dyck, Professor of Neurology at the Mayo Medical School and consultant in Neurology of the Mayo Clinic, whose speciality is peripheral neuropathy, testified that GBS is characterized by a rapid progression of weakness in the proximate and distal muscles associated with loss of reflexes (Dep. at 15) which reach a plateau in the second, third, or fourth week, and then slowly improve (Dep. at 11). Dr. Dyck further testified that he was familiar with the epidemiological data following swine flu immunization and that in his opinion the causation question was "convincing" only where the onset of symptoms occurred two to three weeks after inoculation (Dep. at 88).

Plaintiff's onset of symptoms occurred approximately one month to five weeks after inoculation and were predominantly sensory, followed by muscle weakness within two weeks. The symptoms were not ascending, and she did not manifest involvement of the cranial nerve. While Plaintiff did manifest an abnormally elevated protein level, the significance of this finding is undermined by Dr. Chandler's opinion that it was due to faulty testing. She did not demonstrate areflexia. I am unable to find, based on the foregoing, that Plaintiff has proven that she suffered from GBS syndrome.

Plaintiff contends alternatively that the proofs establish that Plaintiff's injury, if not GBS, was caused by the swine flu vaccine.[2] Plaintiffs rely on the deposition of Dr. Charles M. Poser. Dr. Poser did not examine Mrs. Marneef, and Plaintiff fails to identify any specific symptomology which would allow me to conclude that Mrs. Marneef's condition was caused by the vaccine. With respect to Mrs. Marneef's particular injury, Dr. Poser's testimony raises no more than the inference that Mrs. Marneef's condition falls within the 90 percent of the cases which the doctor felt would manifest symptoms within a month to five weeks of vaccination (Dep. at 45–46).

---

**2.** Plaintiff relies on the depositions of Doctors Richard Restah and Joseph A. Bulctine. These depositions, like that of Dr. Schaumburg referred to above, were formally objected to by Defendant, on the ground that Plaintiff had failed to provide a foundation for a determination that the witnesses are qualified as experts. By order dated August 20, 1981, the Court sustained the objection while giving Plaintiff leave to submit such data within ten days. No data was submitted.

The MDL deposition testimony submitted by Defendant included the testimony of Dr. Dyck, Dr. Barey Nathanson, a virologist and epidemiologist, Dr. Henry F. Relaiteau, an epidemiologist, and Dr. Fred Davenport, retired Professor and Chairman of the Department of Epidemiology of the School of Public Health, University of Michigan, and a member of the Ad Hoc Study Group on Influenza of the Armed Forces Epidemiological Board. The testimony offered shows that, with the exception of GBS and rare cases of anaphylaxis, there is no epidemiological basis for the conclusion that there is a causal relationship between swine flu vaccination and neurological disorders (Defendant's Exhibit 23). The report of the Center for Disease Control on the reactions nationwide to the program concludes that no illness other than GBS occurred at a rate higher than normal incidence in the non-vaccinated population. Moreover, none of the doctors who examined Plaintiff testified that her condition, if not GBS, was caused by the swine flu. *See, e.g.,* Gutterman Dep. at 49.

■ In short, I conclude that Plaintiff has failed to prove by a preponderance of the evidence that her peripheral neuropathy was caused by a swine flu inoculation.

While I have concluded that causation is the dispositive issue in the present case and that Plaintiff has not sustained the burden of showing that the vaccine was a proximate cause of her injury, several of the remaining issues will be briefly addressed.

■ Plaintiff's contention that the Government failed to give proper warnings of the risks of inoculation is refuted by Defendant's Exhibit 35 and MDL testimony which establishes that prior to October of 1976 no neurological disease, including GBS, was known to be causally related to flu vaccinations. Plaintiff notes the existence of ten reported cases of different types of neurological disorders which were associated with flu vaccinations and to the deposition testimony of Dr. Michael Hartwick of the Center for Disease Control (CDC) who testified that he anticipated neurological disorders as a result of the immunization program.

In connection with institution of the National Influenza Immunization Program, the Bureau of Epidemiology undertook a national surveillance system to evaluate illnesses reported following vaccination. Dr. Hartwick became Director of the Surveillance and Assessment Center. As part of his responsibility, he prepared reports which were forwarded to those in charge of drafting the consent form. Dr. Hartwick acknowledges that a search of the entire medical literature at CDC had revealed ten cases of neurological phenomena occurring days after vaccination while stating that "clear association with vaccination has not been made" (Dep. at 193). Other MDL witnesses established that fifteen million privately administered influenza vaccinations have been given annually in the United States since 1957 (Dowdle Dep. at 337), and Dr. Hartwick testified that, while he knew neurological problems were related to flu (and other immunizations), there was no evidence of causal connection as of 1976. Thus, Dr. Hartwick's testimony is consistent with the testimony of other witnesses from the CDC that in 1976 it was not known that flu vaccine caused GBS or other neurological disorders.

Dr. Hartwick testified, moreover, that in his opinion the warning that serious and potentially fatal reactions could occur constituted a sufficient warning of the potential risk (Dep. at 241–42), Dr. Gilroy testified that the particular form signed by Plaintiff comports with the standard of care in this community in 1976, and no evidence, MDL or otherwise, has been offered by Plaintiff as to whether the standard of care required a specific warning to vaccination recipients of potential neurological problems.

■ The duty to provide written informed consent was explicitly assumed by the United States in the Act. 42 U.S.C. 247b(j)(1)(F) (amended 1978). Plaintiff has not persuaded me that Congress thereby intended to hold the United States liable on theories of strict or absolute liability. I

conclude, therefore, that Plaintiff must prove negligence to recover because of inadequate warning. State law determines the standard to be applied. In Michigan, "when liability turns on the adequacy of a warning, the issue is one of reasonable care, regardless of whether the theory pled is negligence, implied warranty or strict liability in tort." *Smith v. E. R. Squibb & Sons*, 405 Mich. 79, 90, 273 N.W.2d 476 (1979).

■ While a cogent case can be made that the duty of disclosure is imposed by law irrespective of community medical standards, *see Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.1972) *cert. den.*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), Michigan law defines the scope of the duty by reference to the standard of customary practice by the profession in the community, *Roberts v. Young*, 369 Mich. 133, 140, 119 N.W.2d 627 (1963); *Heins v. Synkonis*, 58 Mich.App. 119, 122, 227 N.W.2d 247 (1975), and requires that expert testimony be proffered on the issue "unless the injury is of such a character that laymen could find negligence." *Id. See also* Mich. SJI2d 30.02, Informed Consent (1981).

The consent form, which Mrs. Marneef undisputedly received and signed, stated under the heading "Possible Vaccine Side Effects": "Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headaches, or muscle aches within the first 48 hours." Under "Special Precautions," the form reads:

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

* Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.
* People with known allergy to eggs should receive the vaccine only under special medical supervision.
* People with fever should delay getting vaccinated until the fever is gone.
* People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

The registration form advised Plaintiff of possible severe or potentially fatal reactions to the vaccine. The risk was thus disclosed; the proposition that the Government's duty to Plaintiff included an explanation of the physiological source of the risk, that is, neurological disorder, is supported neither by citation of Michigan authority nor by the record. While advice to a physician of randomly occurring neurological side effects may reasonably be required in order to assist in the identification and treatment of patients who manifest such symptoms, *see Sterling Drug, Inc. v. Cornish*, 370 F.2d 82, 85 (8th Cir. 1966), the information of import to the patient in making an informed choice is the fact that death or severe reactions could occur. Nor do I conclude that the overall import of the information given improperly promoted the program. The overwhelming weight of the medical evidence, including that referenced by Plaintiff (Drs. Sabin, Watson, for example) establishes that the anticipated risks were anecdotal and miniscule. "Therefore to bring in in any substantial way a discussion of risk, in fact would be a gross dislocation." (Watson Dep. at 48–49.) More controversial, and the issue as to which several doctors' testimony was principally directed, was the medical controversy over the need for the program. Hence, it is argued that a failure to inform the public generally and the individual recipient in the registration form of the controversy regarding the likelihood of an epidemic as well as its anticipated virulence impaired Plaintiff's evaluation of the risks and benefits of the procedure. Plaintiff has cited no law in support of this argument, and I note that factually this argument is dependent on a favorable preliminary finding that the connection between inoculation and GBS or other neurological disorders was known to the Government.

Short of this finding the argument appears to translate as a claim that the program should not have been undertaken. (See Deps. of Drs. Katy, Mordeel, Cooke.)

Finally, while Plaintiff claims that the swine flu vaccine was inadequately tested, such contention would establish liability only if it were causally related to Mrs. Marneef's claim that the size of the human test group was too small to permit detection of GBS. This claim is resolved by the conclusion that Mrs. Marneef did not contract GBS, as is the contention that a large portion of the volunteers received a different vaccine than the one isolated at Fort Dix.

Having concluded that Plaintiff's condition was not GBS but rather an axonal neuropathy, any inference as to causation from the temporal relationship between the vaccination to the condition, even if legally permissible, is logically undermined by the finding of the CDC that, among the forty million persons vaccinated, the rate of neurological disorders other than GBS was below those rates anticipated from the rates of first visits to physicians for these illnesses in the general population. (MDL Exhibit 116.)

Accordingly, for the reasons stated, IT IS HEREBY ORDERED that the Clerk enter judgment in favor of Defendant.