**Verlin G. UNTHANK, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 82–2272.

United States Court of Appeals, Tenth Circuit.

May 1, 1984.

Jeffrey Axelrad, Washington, D.C. (Mary Ann Murphy, Dept. of Justice, Washington, D.C. and Leslie C. Ohta, with him on brief) (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., and Brent Ward, U.S. Atty., Salt Lake City, Utah, also with him on brief), for defendant-appellant.

Clark W. Sessions, Salt Lake City, Utah (John F. Clark, Salt Lake City, Utah, with him on brief), of Sessions & Moore, Salt Lake City, Utah, for plaintiff-appellee.

Before BARRETT, McKAY and LOGAN, Circuit Judges.

McKAY, Circuit Judge.

This is one of many cases growing out of the now notorious national swine flu immunization program of 1976, Pub.L. 94–380; 42 U.S.C. § 247b(j)–($l$) (1976) (Swine Flu Act). As the record in this case, numerous other reported cases, and the legislative history indicate, Congress became concerned about a possible swine flu epidemic and, acting in a state of near emergency, passed the Swine Flu Act. The country was inundated with efforts urging people to go ahead with the swine flu vaccination program notwithstanding the reluctance of the drug industry and insurance companies that essentially refused to proceed unless the United States Government assumed all liability that might arise from the vaccination program.

In that context, the plaintiff in this case undertook the swine flu inoculation program. At trial below, the trial court found that the plaintiff contracted transverse myelitis as a direct and proximate result of the swine flu vaccination. The court also found that development of transverse myelitis as a proximate result of the swine flu inoculation was predictable under the state of the medical science in 1976, when this vaccine was administered to the plaintiff. These fundamental findings are not challenged on appeal but in any event are abundantly supported by the record developed in this case. Again, on abundant evidence, the trial court accepted the testimony that:

Like [Guillain-Barre Syndrome (GBS) ], many neurologists feel that transverse myelitis is an autoimmune reaction to an antigen challenge, resulting in the destruction of myelin in the nervous system. Although GBS involves the peripheral nervous system and transverse myelitis the central, the mechanism by which demyelination occurs is thought to be the same. (*See generally* Poser, M.D. L.Depo., pp. 20–30). It is logical to conclude that the time factor for demyelination in transverse myelitis is likewise similar. (footnote omitted).

*Unthank v. United States,* 533 F.Supp. 703, 714 (D.Utah 1982) (footnotes omitted).

The only question on appeal is the basis for liability. Plaintiff has alleged a variety of theories. While the trial court purported to reject several of them, we believe the trial court's ultimate conclusion that the federal government was liable must be sustained, not only on the ground which the trial court purported to give but on at least two additional theories compelled by the law and the court's findings of fact.

The Swine Flu Act provides:

[T]he liability of the United States arising out of the act or omission of a program participant may be based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort and breach of warranty.

42 U.S.C. § 247b(k)(2)(A)(i). All three of the named theories are available under the law of the State of Utah where this vaccination was administered.

The trial court found on overwhelming evidence:

With unparalleled haste, the bill came before the Senate on August 10, 1976, without hearings or a committee report, and was passed in amended form. 122 *Cong.Rec.* 26639 (August 10, 1976). The bill was sent to the House of Representatives, and even though many members had neither seen nor read the legislation, was expeditiously passed that same day. *Id.* at 26817. President Ford signed the National Swine Flu Immunization Program of 1976 into law on August 12, 1976.

Between October 1, 1976 and December 10, 1976, over 40 million Americans— or one-third of the adult population of the United States—were vaccinated. This made the Swine Flu Act the largest vaccination program in history. In conjunction with the Swine Flu Act, the Department of Health, Education and Welfare conducted a surveillance program to evaluate illness temporally associated with influenza vaccination. By December 2, 1976, seven cases of GBS in two clusters had been reported. On December 16, 1976, based on data from four test states, the immunization program was suspended.

533 F.Supp. at 717.

Against this backdrop, the legislative history of the bill, whose precise language was not reviewed carefully by the individual members of Congress, becomes particularly important. Indeed, the Senate Appropriations Committee reported that "careful and indepth review [of the Swine Flu Act] was not possible." S.Rep. 94–1147, 94th Cong., 2d Sess. *reprinted in* 1976 U.S.Code Cong. & Ad.News 1987.

The trial court was particularly impressed, as we are, with the explicit statements of Senator Harrison A. Williams, Jr. of New Jersey in discussing the reasons for enacting this bill establishing liability against the federal government. He said:

This is pioneering in the sense, it has never been done before, but it is in response to an emergency. That is the way the liability fixes upon the government, through the total class act, for *any misfortune which would follow, as defined, the administration of the inoculation and vaccine* ... 192 [sic] Cong. Rec. 26632 (August 10, 1976) (emphasis added).

533 F.Supp. at 719.

The trial court was also impressed, as we are, with the statement of Congressman Paul G. Rogers of Florida:

[W]e have asked the drug companies to produce this vaccine. We have told them how to do it. We have told them the dosage we want, what strength. We gave them the specifications because we are the only buyers, the Government of the United States. This is not the usual process of going out and selling. But *if someone is hurt, we think people ought to have a remedy.* [122 Cong.Rec. at] p. 26796 (emphasis added).

533 F.Supp. at 719.

The trial court also accurately noted that in response to the outbreak of GBS, then Secretary of Health, Education and Welfare, Joseph A. Califano, Jr., responded to the difficulties experienced after the administration of the program and the eruption of litigation. He declared that with respect to those alleging GBS, the policy of the government was to provide compensation to all who contracted GBS from the swine flu vaccine. Secretary Califano stated that those who contract GBS:

[W]ill not need to prove negligence by Federal workers or others in the Swine Flu Program as required by Federal law and the law in many states. Instead claimants in most cases need to show only that they in fact developed Guillain-Barre as a result of a Swine Flu vaccination and suffered the alleged damage as a result of that condition. (Statement of Secretary Califano, June 20, 1978).

533 F.Supp. at 718.

As the trial court noted, the Secretary gave two reasons for this policy:

First, the informed consent form ... did not warn individuals that there was a one in one hundred thousand risk that a person receiving a flu shot would contract Guillain-Barre and that one in every two million would die from the condition ... Second, in the Swine Flu program, the Federal Government, in an unprecedented effort, actively urged millions of Americans to get flu vaccination shots and funded the nationwide campaign. Thus we have decided to provide *just*

*compensation* for those who contracted Guillain-Barre as a result of the Swine Flu program rather than force many individuals to prove government negligence in protracted proceedings. (*Id.*) (Emphasis added).

533 F.Supp. at 718 (footnotes omitted).

■ The Justice Department adopted the position of the Secretary for purposes of litigation. Based on this and other considerations, the trial court expressly held that Landry-Guillain-Barre Syndrome (GBS) is a broad, encompassing term which would include the transverse myelitis found in this case. *Id.* at 719. We believe the record supports the trial court's conclusion. So long as it is proven to have been caused by the vaccination program, transverse myelitis is included in the concession of liability made by the Secretary. Although the trial court said it did not ground its decision solely on that basis, *id.*, we believe it is sufficient to support the trial court's determination.

In concluding that the Secretary was bound by his concession of liability, the court went on to give additional reasons for concluding that liability attached to the United States in this case. The trial court's additional findings and conclusions were, on their face, apparently meant to support its original conclusion that liability was grounded on a concession of liability in these cases falling broadly within the more generic understanding of the meaning of Landry-Guillain-Barre Syndrome. We believe those findings also support two other theories the court ostensibly rejected.

■ First, even though the trial court expressly purported to reject a theory of inadequacy of the informed consent in this and in a previous case not appealed (*Bean v. United States*, 533 F.Supp. 567 (D.Colo. 1980)), we think its findings belie that conclusion. Thus, we conclude that the trial court's findings, as a matter of law, support the theory of inadequate informed consent. There is a split of authority among

the trial courts [1] on this issue, but we believe that those concluding that the warnings were inadequate together with the credited evidence in this case can lead to no other conclusion than that the warnings were inadequate in cases such as transverse myelitis, which were known dangers at the time of the program.

■ The doctrine of informed consent is a specialized form of negligence applied primarily in medical malpractice actions, which is essentially what this case is. Under Utah law, absent an emergency or unanticipated conditions, prior to treatment, a physician must inform the patient of all substantial and significant risks that might occur. Utah Code Ann. § 78-14-5 (1977); *Reiser v. Lohner*, 641 P.2d 93, 98 (Utah 1982). Further, the relationship between a doctor and patient creates a duty on the part of the physician to disclose to the patient any material information important to choosing a course of treatment. *Nixdorf v. Hicken*, 612 P.2d 348, 354 (Utah 1980). We believe that encompassed in the duty to inform a patient of all material information, substantial and significant risks is the duty to inform not only of risks that might occur from the particular treatment in question, but also, any alternative treatments and the risk of no treatment at all.

■ While the Swine Flu Act adopts by reference the laws of the jurisdictions in which the cause of action arises, it is nonetheless the act itself which determines the basis for that adoption and the question of whether those state laws should be construed narrowly or liberally. We believe that in cases arising out of the Swine Flu Act underlying state laws must be liberally construed in favor of claimants. The setting for the swine flu program was so

extraordinary that other cases can provide no real precedent. However, the setting cannot be ignored in interpreting the reasonableness of the consent obtained from those who contracted anticipatable and clearly provable maladies as a direct consequence of responding to the urgings of the federal government for people to participate. The act itself was only a part of the entire picture. As the trial court noted:

> In the fall of 1976, the government embarked on a national health preventative program to vaccinate every man, woman and child against a predicted devastating epidemic similar to that of 1918–1919 that saw 450,000 Americans die.

533 F.Supp. at 721. Furthermore, the panic was unfounded. *Id.* at 717–18.

So monumental and effective were the urgings of the government that it resulted in an unprecedented nearly 40 million citizens responding to the call. Both this plaintiff and untold others relied on the government's assurances that the vaccine was both safe and necessary. A barrage of publicity aimed at overcoming the reluctance of citizens to participate included the unprecedented appearance of the President of the United States on national television to plead for a positive response. Against that background, it would be a travesty to suggest that people who hurriedly signed the standardized form presented to them were adequately informed of the risks.

Even the Secretary conceded that the general language of the consent form was inadequate at least as to GBS. *Id.* at 718. In the face of the barrage of urgings from the authorities of the United States Government, it would defy logic and reason to suggest that an adequate warning was provided by the mere mention in the consent form's text that there was a "possibility of severe or potentially fatal reaction."

---

1. *Compare, e.g., Bean v. United States*, 533 F.Supp. 567 (D.Colo.1980); *Marneef v. United States*, 533 F.Supp. 129 (E.D.Mich.1981); and *Warner v. United States*, 522 F.Supp. 87 (M.D. Fla.1981), *with von Michalofski v. United States*, No. C78–568R (W.D.Wash. Jan. 28, 1983); *Petty*

*v. United States*, 536 F.Supp. 860 (N.D.Iowa 1980), reversed and remanded because wrong standard applied, 679 F.2d 719 (8th Cir.1982); and *Hasler v. United States*, 517 F.Supp. 1262 (E.D.Mich.1981), reversed on causation grounds, 718 F.2d 202 (6th Cir.1983).

*Id.* at 716. Perhaps in another context, such a generalized, uninformative statement might satisfy Utah and federal law, but we cannot conclude that in the factual setting in which this program and in which this plaintiff specifically participated, that warning was "informed" for purposes of the act.

■ Second, although the trial court concluded that the plaintiff did not prove strict liability, its analysis supports the conclusion that the legislative history shows an intent to adopt strict liability based on nothing more than a clear supported finding that the swine flu shots caused the complained of injury. In that connection the trial court put great emphasis on Congressman Rogers' statement that, "if someone is hurt, we think people ought to have a remedy" 122 Cong.Rec. 26796 (August 10, 1976), and on the statement of Senator Williams that, "That is the way the liability fixes upon the government, through the total class act, *for any misfortune that should follow, as defined, the administration of the inoculation and vaccine* ..." 122 Cong.Rec. 26632 (August 10, 1976) (emphasis added).

The trial court's further recitation of the congressional record and the milieu in which all of this took place supports the conclusion that the trial court's only real concern was about causation. The trial court correctly concluded that there was sufficient information prior to 1976 that a neurological disorder such as transverse myelitis was a recognized risk of influenza vaccination. 533 F.Supp. at 720. Tying that recognized fact to the statements in the congressional record, it is overwhelmingly clear that Congress intended people who suffered from these consequences to be compensated. It must be remembered that Congress acted in the face of the fact that the manufacturers and the insurance carriers of all kinds so clearly recognized the risks that they were unwilling to proceed.

These recitations based on an adequate record are sufficient to support a cause of action based on "strict liability in tort" expressly mentioned in the Swine Flu Act. 42 U.S.C. § 247b(k)(2)(A)(i). In *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 156 (Utah 1979), Utah adopted Restatement (Second) of Torts § 402A (1965), which reads as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The legislative history, as laid out by the trial court, clearly establishes that the United States Government intended to assume the liability of the seller or manufacturer of the swine flu vaccine and that the vaccine reached the user without substantial change in the condition in which it was sold. Further, the evidence in the record supports a finding that even though the government may have exercised all possible care in the preparation and distribution of the swine flu vaccine, the plaintiff's injury was caused by the vaccine.

Thus, the only question left to be resolved is whether the product was "in a defective condition unreasonably dangerous to the user or consumer." Comment *k* of Restatement (Second) of Torts § 402A (1965) discusses unavoidably unsafe products, particularly in the context of vaccines or drugs. The comment notes that even though many drugs and vaccines are incapable of being produced so that they will

never cause injury, these drugs are not necessarily unreasonably dangerous.

Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A comment *k* (1965).

▇ Having already found that the plaintiff was not adequately warned of the attendant risks of taking the swine flu vaccine and that such a warning was called for by the situation, we find that under the standard set out in the Restatement, the product was "unreasonably dangerous" to the plaintiff. Thus, having assumed the seller's liability, the government is strictly liable for the injury caused to plaintiff by injection of the vaccine.

For the reasons given, the judgment of the trial court is affirmed.