**Mrs. Kathleen N. MILLS, Individually, Michael Wayne Mills, Individually, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 84–4375.**

United States Court of Appeals, Fifth Circuit.

July 1, 1985.

---

Joseph S. Cage, Jr., U.S. Atty., John R. Halliburton, Asst. U.S. Atty., D.H. Perkins, Shreveport, La., Laura D. Millman, Jeffrey Axelrad, Washington, D.C., for defendant-appellant.

Lancaster, Baxter & Seals, Edgar H. Lancaster, Jr., Tallulah, La., Hayes, Harkey, Smith & Cascio, Thomas M. Hayes, Jr., Monroe, La., for plaintiffs-appellees.

Before WISDOM, WILLIAMS and HILL, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

## I.

In August 1976, Congress enacted the National Swine Flu Act, 42 U.S.C. § 247b(j–l) (1976), in response to a perceived threat of a new strain of influenza virus. Initiation of an immunization program was in part prompted by the medical discovery in February 1977 of the swine flu virus in military servicemen at Fort Dix, New Jersey. The strain was related to the one that was prevalent during the 1918–19 swine flu pandemic that was responsible for 20 million deaths worldwide, including the deaths of 500,000 Americans. State, federal, and local authorities, as well as private practitioners, took part in the Swine Flu Immunization Program initiated by the Federal Government. Under the Swine Flu Act, the Federal Government accepted primary responsibility for injuries caused by the manufacture, distribution, or administration of the vaccine. Between October 1 and December 16, 1976, approximately one-third of the adult American population was vaccinated. Subsequent to the inoculations, numerous personal injury and wrongful death claims were filed.

This action was one such claim. Warren Mills and his wife, Kathleen N. Mills, decided to receive the swine flu inoculation. Mr. and Mrs. Mills had learned through Government-instituted newspaper and magazine articles, radio and television commercials, news programs, and a nationwide broadcast by President Ford, of the possibility of swine flu epidemic and the Government's vaccination program. On October 21, 1976, the Mills proceeded to the Madison Parish Health Unit in Tallulah, Louisiana, where the vaccine was being administered free of charge.

Mr. Mills was given two documents to read concerning the swine flu vaccine just before he received the inoculation.[1] The

---

1. The Swine Flu Act called for the development of a written informed consent form and procedure "for assuring that the risk and benefits from the swine flu vaccine are fully explained

first was entitled "Important Information from the U.S. Public Health Service about Swine Flu and Victoria Flu Vaccines: Introduction." This form provided very general information about the vaccine, informed vaccinees that persons who believed they had been injured by the inoculation might have a claim against the United States, and encouraged vaccinees to read carefully the other attached information. The last sentence of this form read, "You will be asked to sign a form indicating that you understand this information and that you consent to vaccination." The second document, entitled "Important Information about Swine Influenza (Flu) Vaccine (Monovalent)", included the following warning:

Possible Vaccine Side Effects

Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache, or muscle aches within the first 48 hours.

Special Precautions

As with any vaccine or drug the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions.

Directly under the list of warnings was indicated "If you have any questions about flu or flu vaccine, please ask." The bottom third of the form was marked "Registra-tion Form", and was signed by Mr. Mills.[2] He then received his vaccination.

Shortly afterwards, in the parking lot of the Unit, Mills became ill. Help was sought at the Unit, and two members of the Unit's staff came out and administered cardio-pulmonary resuscitation. Mills was also given epinephrine by injection. He was taken to a hospital in an ambulance and was pronounced dead approximately twenty minutes after his physical difficulties began.

Mr. Mills was 55 years old at the time of his death and had no prior history of cardiovascular problems. An autopsy performed on the decedent 18 hours after his death indicated that the cause of death was a myocardial infarction or coronary occlusion.[3] Mr. Mills was subsequently determined to have suffered an extremely rare and severe allergic reaction to the vaccine known as anaphylactic shock. This allergic reaction produced the myocardial infarction which resulted in Mr. Mills' death.

Mrs. Mills and her dependent son, Michael Wayne Mills, instituted administrative proceedings under the Federal Tort Claims Act. This procedure was required by the Swine Flu Act.[4] The Mills' claim was denied, and this action was then filed in the United States District Court for the Western District of Louisiana. Pursuant to an order of the Judicial Panel on Multidistrict Litigation (see 28 U.S.C. § 1407), the case was consolidated along with other swine flu cases for pretrial discovery and

to each individual to whom such vaccine is to be administered.... Such procedures shall include the information necessary to advice [sic] individuals with respect to their rights and remedies arising out of the administration of such vaccine." 42 U.S.C. § 247b(j)(1)(F). The two documents given to Mr. Mills were drafted in accordance with this provision.

2. That part of the form provided, "I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risk of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian."

3. Myocardial infarction is a type of heart attack brought about by circulatory failure or loss of blood supply to the heart. Mr. Mills' reaction to the vaccine was compounded by the fact that Mr. Mills was suffering from heart disease, which contributed to the myocardial infarction that resulted in heart failure. However, Mr. Mills' heart condition was unknown to him at the time he received the vaccine.

4. The Swine Flu Act, 42 U.S.C. § 247b(k)(2)(A), provided that claims arising under the Act were governed by the procedures of the Federal Tort Claims Act. Under 28 U.S.C. § 2675(b) of the FTCA, an injured party had to present his claim to the appropriate administrative agency before filing an action in district court.

transferred to the United States District Court for the District of Columbia. Upon issuance of the final pretrial order, the action was remanded to the Western District of Louisiana.

A bifurcated trial was held by the district court. The first portion of the trial considered only the question of causation. The district court found that the vaccination was the legal and proximate cause of Mr. Mills' death. The second portion of the trial addressed the issue of the Government's liability for Mr. Mills' death. It is this portion of the trial that is the subject of this appeal. In a non-jury trial, the district court found that the Government was negligent in that it had a duty to warn Mills of all material risks of the inoculation, including the risk of anaphylaxis, and that the Government's failure to do so resulted in Mr. Mills' death, for which the plaintiffs were awarded $270,000.

On appeal, we consider whether the Government had a duty to warn Mr. Mills of the risk of anaphylaxis and, if so, whether the Government adequately carried out that duty, raising the issue of liability for negligence. We also consider whether the Government is liable for damages under a theory of strict liability. We reverse the district court and hold that the Government's warnings with respect to the risk of anaphylactic shock were sufficient and that the Government therefore is not liable for Mr. Mills' death under either a theory of negligence or under the warning requirement of Louisiana's law authorizing recovery based upon strict liability.

## II.

The Swine Flu Act created a cause of action against the United States for any personal injury or wrongful death resulting from the swine flu inoculation. The United States was solely liable under the Act for the acts or omissions of program "participants", which included manufacturers, distributors, and administrators of the vaccine. 42 U.S.C. § 247b(k)(3). Claims for damages could be premised upon "any theory of liability". 42 U.S.C. § 247b(k)(2)(A)(i). The procedures prescribed in the Federal Tort Claims Act ("FTCA") were made applicable to claims brought under the Swine Flu Act. 42 U.S.C. § 247b(k)(2)(A).

Under the FTCA, which provides the jurisdictional basis for this action, the "... law of the place where the act or omission occurred", is applicable for personal injury and wrongful death actions brought against the United States. 28 U.S.C. § 1346(b). Mr. Mills was vaccinated at the Madison Parish Health Unit in Tallulah, Louisiana. The issues of liability must therefore be determined under Louisiana law.

### A. The Negligence Claim.

The district court's conclusion that the United States was liable for Mr. Mills' death was based on the theory that the Government's failure to warn Mr. Mills of the risk of anaphylactic shock was a breach of duty owed to the decedent. The district court, considering the adequacy of these warnings under Louisiana law,[5] found that the United States was negligent because the warnings fell short of the standards prescribed under Louisiana informed consent law. The court found that the Government had a duty to disclose all material risks involved in the administration of the vaccine, and that by failing to inform Mr. Mills of the risk of anaphylaxis, the Government had breached this duty. In so concluding, however, the court failed to consider the Louisiana Supreme Court's de-

---

**5.** We also note that the district court held that the warnings were inadequate under a federal standard of informed consent. The court construed 42 U.S.C. § 247b(j)(1)(F) as creating a standard of informed consent as described under the Swine Flu Act. But this Court has previously held that no such nationwide standard of liability exists. *Freeman v. United*

*States,* 704 F.2d 154, 157 (5th Cir.1983). The mere directive that the Secretary of Health create an informed consent form and procedures did not establish a standard by which the sufficiency of the inform consent was to be evaluated. *See also Daniels v. United States,* 704 F.2d 587 (11th Cir.1983); *Petty v. United States,* 679 F.2d 719 (8th Cir.1979).

cision in *LaCaze v. Collier*, 434 So.2d 1039 (La.1983), in which the court specifically held that the materiality standard of informed consent had been superseded by Louisiana's Uniform Consent Law, La.Rev. Stat.Ann. 40:1299.40 (West 1977).

The Louisiana Uniform Consent Law, enacted in 1976, provides as follows:

A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures (b) acknowledges that such disclosure of information has been made and that all procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.

C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.

In *LaCaze*,[6] the defendant argued that the Uniform Consent Law merely intended to provide an evidentiary rule, and that if the procedures of the statute were followed, a presumption would be created that the consent of a patient was valid. The defendant argued that the statute did not intend to affect the substantive law on informed consent. The court held, however, that the statute was more than a mere evidentiary rule and that it was intended by the legislature to redefine the jurisprudential rules relating to the disclosure requirement. The court concluded that the statute was broader than the previous materiality standard with respect to required disclosure of risks inherent to a proposed treatment or procedure. The court in comparing the materiality standard with the statutory standard said:

Under the materiality standard, both the severity of the consequence and the probability of occurrence are weighed by the physician; under the statutory rule, the consequences are listed, and the physician's requirement is to disclose all *known* risks of the listed consequences occurring, whether or not the probability of the occurrence is remote. No longer is the physician required to discuss with the patient alternatives to the proposed treatment. The "materiality" of the undisclosed risk, as such, need not be litigated.

R.S. 40:1299.40, has therefore, superseded, in Louisiana, the jurisprudential

---

**6.** *LaCaze* involved a malpractice suit brought by a woman who developed a vesico-vaginal fistula as a result of a hysterectomy. The fistula, which is an abnormal opening between two organs of the body, resulted from the possible nicking of the bladder while the physician was performing the hysterectomy, causing urine to flow out through the vagina. The physician in *LaCaze* failed to warn the patient of the risk of developing a fistula. *See also infra,* note 9, for further discussion of *LaCaze.*

rules defining "consent to medical treatment." A patient's consent to treatment must be measured by the standards contained in Subsection A or Subsection C of the statute.

*Id.* at 1046. Under this standard, the question before us is whether the Uniform Consent Law required the Government to disclose the risk of anaphylaxis. According to *LaCaze,* failure to make disclosures required under the Uniform Consent Law constitutes a breach of duty on the part of the Government.

The Government argues that by warning of the risks of fatal or allergic reactions, it had adequately informed Mr. Mills of the risk of anaphylaxis under Louisiana law. We first note briefly the nature of the allergic reaction known as anaphylaxis. Anaphylactic shock is an extremely rare and serious allergic reaction to any number of substances. It is an acute, severe and sudden allergic reaction against a foreign protein or antigen that enters the body. The agents of anaphylactic shock are many, including proteins, vitamins or chemicals. The shock can only occur in individuals who have had prior exposure to the particular substance that promotes the shock. The prior exposure "sensitizes" the individual to that substance. When the protein or antigen is reintroduced into the body, an aberrant attempt to eliminate the substance may result in anaphylactic shock. An individual may be exposed to a particular substance for years before manifesting signs of an anaphylactic reaction, as has been known to happen with penicillin. The shock can manifest itself in several ways, affecting the heart, respiratory system or skin. Penicillin, anesthetics, peanuts, seafoods, and stinging insects are the most common and serious sources of anaphylactic producing agents.[7]

Mr. Mills had previously been exposed to a flu vaccine when he received a series of shots in 1962 and 1963. Although the vaccine was related to a different strain of flu, it was apparently closely enough related to sensitize Mr. Mills to the swine flu vaccine with the resulting anaphylactic shock and death.

The Government warning read and signed by Mr. Mills notified him that the swine flu vaccine could result in "allergic reactions" or in "severe or fatal reactions". Appellees argue that this warning was too vague to warn adequately of the risk of anaphylactic shock. Under the Louisiana Uniform Consent Law, known risks of death must be disclosed. Anaphylaxis was a known, albeit rare, risk of death. Excluding Mr. Mills, 11 out of 49 million persons, or .00002 percent of those who received the swine flu vaccine, had an anaphylactic reaction to the serum. Not one of these other reported cases resulted in death; Mr. Mills is apparently the only fatality on record.

We find that the Government warning that the swine flu vaccine could result in severe, fatal or allergic reactions complied with the Uniform Consent Law with respect to anaphylaxis. Although anaphylaxis was a known risk of death, Mr. Mills would not have been any better informed of the risks of the vaccine had he been told that a severe allergic reaction to a substance such as vaccine serum was called "anaphylaxis". Furthermore, we do not feel that any greater detail of the pathology of anaphylatic shock was required to put Mr. Mills on notice of the risk of this rare reaction. The Government could do no more than warn Mr. Mills that in receiving the vaccine, he could have a severe or fatal allergic reaction, as he or anyone could to any drug, injection or chemical substance. We therefore hold that the Government's warning was adequate to inform Mr. Mills of the risk of suffering a fatally allergic reaction to the vaccine.

The district court, in concluding that the Government's warnings were insufficient, relied heavily on decisions from two other circuits where the same warnings were

---

7. S.A. Kaplan, M.D., "Anaphyalaxis: Diagnosis, Prevention and Treatment", 13 *Continuing Edu-* *cation* 27 (July 1980).

held to be inadequate. *See Petty v. United States*, 740 F.2d 1428 (8th Cir.1984); *Unthank v. United States*, 732 F.2d 1517 (10th Cir.1984). However, neither of those decisions reviewed the adequacy of the warnings with respect to anaphylaxis. In *Petty*, the Eighth Circuit held that under Iowa law, the Government failed to warn the plaintiff adequately of the risk of serum sickness.[8] The plaintiff in that case suffered from inflamation and swelling of the joints from which he never fully recovered. Serum sickness is a well-known and common disease resulting specifically from vaccine injections. The Eighth Circuit held the Government warnings to be inadequate because they failed to indicate in any way that such a disease was a possible risk of receiving the vaccine.

In *Unthank*, the Tenth Circuit held that the Government warnings were inadequate with reference to the condition of transverse myelitis suffered by the plaintiff in that case. The issue in *Unthank* was whether myelitis was a condition sufficiently linked to Guillain-Barre Syndrome (GBS) to include the plaintiff's injuries in the class of cases for which the Government had already conceded liability. GBS is a neurological disorder suffered by many who received the swine flu inoculation. In response to the outbreak of GBS following the immunization program, the Secretary of Health, Education and Welfare declared that with respect to persons alleging GBS, the policy of the government would be to concede liability and provide compensation. The Tenth Circuit upheld the district court's finding that this concession of liability encompassed myelitis because it was closely enough related to the disorders produced by GBS.

The courts in both *Petty* and *Unthank* reached their respective conclusions based on the same analysis we have followed here. The question of the adequacy of the warnings must be confined to consideration of whether the warnings were sufficient to inform the plaintiff of the risk of the particular condition or disease which allegedly caused his injury or death. Thus, our conclusion that the warnings were sufficient with respect to anaphylaxis has no bearing on whether those same warnings would adequately inform vaccinees of other risks such as serum sickness or myelitis. Similarly, a determination that warnings were inadequate with respect to some other condition does not bear on our conclusion that Mr. Mills was adequately informed of the risk of severe allergic reaction to the swine flu vaccine.

Under the Louisiana Informed Consent Law, we hold that the Government met the remaining requirements of Section 40:1299.40(A)(a) as well. There is no dispute that the disclosure was made in writing, or that Mr. Mills signed the form indicating that he had been given the opportunity to ask questions concerning the risks involved in receiving the vaccine. Under the Informed Consent Law, a presumption of validity of the consent is created where there has been compliance with the statutory prerequisites. La.Rev.Stat.Ann. 40:1299.40(A). The plaintiffs here offer no evidence that would rebut the presumption that the consent was valid. Because the Government obtained Mr. Mill's informed consent under Louisiana law, there was no breach of duty. The Government therefore is not liable for damages resulting from the death of Mr. Mills under a negligence theory.[9]

---

**8.** We note that Iowa has also enacted an Informed Consent Law that is nearly identical to the Consent Law adopted in Louisiana.

**9.** We note that even if the warnings had been inadequate, appellees would not have been able to recover because they have not demonstrated that had Mr. Mills been warned more specifically of the risk of anaphylaxis, he would have foregone the vaccine. This causation element requires not only that the plaintiff show that the

undisclosed risk was the cause of his injuries, but "the plaintiff must also prove that if the risk has been disclosed, the treatment and the unwanted consequences would have been avoided". (footnote omitted) *LaCaze*, 434 So.2d at 1048. The standard adopted by the *LaCaze* court to determine this causation issue is that of a reasonable person in the patient's position. In *LaCaze*, although the court did find that the doctor's notice to the plaintiff was inadequate,

### B. *The Strict Liability Claim.*

Appellees also urge that the Government is strictly liable for Mr. Mills' death.[10] The Swine Flu Act permits injured individuals to sue the Government based on any theory of liability, including strict liability. 42 U.S.C. § 247b(k)(2)(A). As with claims of negligence, the existence of strict liability must be determined with reference to the law of the state where the injury occurred.

█ In Louisiana, a manufacturer of a product which involves a risk of injury to the user is liable to any person, whether purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in design, composition or manufacture of an article, if the injury might reasonably have been anticipated. *Hebert v. Brazzel,* 403 So.2d 1242, 1244 (La.1981); *Weber v. Fidelity & Casualty Ins. Co. of N.Y.,* 259 La. 599, 250 So.2d 754, 755 (La. 1971). Under the Swine Flu Act, the United States has assumed exclusive responsibility for any liability established on the part of a program participant in the administration of the swine flu vaccine. 42 U.S.C. § 247b(k)(2)(A). Hence, an injured individual alleging that the swine flu vaccine was defective has a cause of action exclusively against the Government.

█ Appellees do not allege that the vaccine itself was defectively manufactured, but argue that the swine flu inoculation was an unreasonably dangerous product, and that the manufacturer therefore had a duty to warn of that danger. A manufacturer has an obligation to warn of any dangers inherent in a product's normal use which would not be within the knowledge of an ordinary user. *Hebert,* 403 So.2d at 1245; *Chappuis v. Sears Roebuck & Co.,* 358 So.2d 926 (La.1978), *writ denied,* 366 So.2d 576 (1979). Because the Government stands in the shoes of the manufacturer for purposes of liability under the Swine Flu Act, any liability for failure to warn of the risk of anaphylaxis is assumed by the Government. Even if it is assumed that the vaccine was an unreasonably dangerous product, we have already determined that the Government's warning of possible allergic or severe reactions to the swine flu vaccine was adequate to inform Mr. Mills of the risk of anaphylactic shock. Therefore, for purposes of establishing strict liability, the appellees have not demonstrated a breach of duty on the part of the manufacturers for which the Government could be held liable. Appellees are not entitled to damages on this theory.

### C. *Negligence of the Clinic.*

█ Finally, appellees contend that the Government is liable for what they argue is the negligence of the Unit where the vaccine was administered. Appellees allege that the Unit was not properly staffed because there was not a physician on duty at all times. Although no physician was on duty at the Unit, one was on call to respond to any emergencies arising from the administration of the vaccine. In fact, a physician did respond to a call placed in reference to Mr. Mills' condition.

There is no proof in the record that had a doctor been on duty at the Unit he could have done more for Mr. Mills than was done by the Unit operators. All of the medical literature admitted into evidence by the appellees indicates that the proper emergency response to anaphylaxis is to

---

the plaintiff was barred from recovery because she had not met this burden of causation.

Mr. Mills was 55 years old at the time of his death. Although the autopsy indicated that he had rather severe atherosclerosis, he had never been diagnosed as having a heart-related condition. Post-program statistics confirm the failure of appellees to prove that if there had been full warning as to the specific danger of anaphylaxis Mr. Mills would have declined to be vaccinated. Out of 49 million vaccinations administered, there were only 11 other reported cases of anaphylaxis or, .00002 percent of all vaccinees. None of these other instances resulted in death. Given the extremely rare incidence of anaphylactic shock, the plaintiffs have not demonstrated that a reasonable person would have foregone the vaccine had more specific information on anaphylaxis been provided.

**10.** The district court granted relief on plaintiff's negligence claim only and did not reach the strict liability claim.

administer epinephrine. Cardio-pulmonary resuscitation (CPR) is also advised. Mills was administered CPR and given an injection of epinephrine within minutes of his discovered difficulties. Therefore, we find no negligence on the part of the Unit for failure to respond adequately to Mr. Mills anaphylactic shock.

## III.

Under Louisiana law, which is controlling in this action, we hold that Mr. Mills' consent to the swine flu vaccine was validly obtained and that there was no breach of duty on the part of the Government. Because we conclude that any question of liability against the Government turns on the adequacy of the warning given with respect to the risk of anaphylaxis, our determination that the warnings were sufficient compels the conclusion that the Government cannot be held liable for Mr. Mills' death on either a theory of negligence or strict liability. Accordingly, we reverse the judgment in favor of appellees and direct that the district court render judgment that appellees take nothing in this suit.

REVERSED AND RENDERED.