Kathleen **HASLER** and Michael Hasler, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

Civ. A. No. 78–70130.

United States District Court, E. D. Michigan, S. D.

July 15, 1981.

Tucker, Barbour & Mack, P.C. by James A. Tucker, David M. Barbour, Detroit, Mich., for plaintiffs.

Stuart Schiffer, Acting Asst. Atty. Gen., Richard A. Rossman, U. S. Atty., Detroit, Mich., Jeffrey Axelrad, Director, Torts Branch by Debra Newman, Thaddeus B. Hodgdon, Trial Attys., Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

GILMORE, District Judge.

This is an action by Kathleen Hasler and her husband Michael Hasler to recover for injuries allegedly suffered as a result of a swine flu injection received by Mrs. Hasler. Mr. Hasler derivatively sues for loss of consortium, loss of services and the like.

On November 24, 1976, plaintiff Kathleen Hasler received a swine flu vaccination under the National Swine Flu Immunization Program at the Penrickton Center for Blind Children in Taylor, Michigan. The swine flu vaccine administered to her was manufactured, formulated, processed, and sold by Merck, Sharp and Dohme, a division of Merck and Company, a program participant pursuant to 42 U.S.C. § 247b. The Penrickton Center for Blind Children was also a program participant pursuant to the statutory section cited above. Jurisdiction is conferred on the Court by the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b.

Prior to her vaccination, plaintiff had seen and heard mass media advertisements that said there was a good possibility of a swine flu epidemic throughout the United States, and that the United States Government was attempting to vaccinate every man, woman, and child in the country. She testified that she saw President Ford on television telling the American people that everyone should get a swine flu shot, and that she heard nothing about the risks of taking the swine flu shot. She said she felt it was her duty to have a shot to help build immunity in the community, and she was especially concerned about it because she was employed as a receptionist at a pediatric clinic and she feared the possibility of infecting children in the clinic.[1]

Immediately prior to receiving her shot, plaintiff was provided with a registration form which she scanned and signed. She did not read the form. The worker at the clinic told her that the only possible side effect would be some swelling at the site of the shot and perhaps a fever. This form, which was received as Defendant's Exhibit 30, said, with reference to side effects:

"Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headaches or muscle aches within the first forty-eight hours.

"As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. . . ."

At the time she took the shot, and prior to December 3, 1976, plaintiff was in excellent health, as was her husband.

Ten days after taking the shot, on December 3, 1976, plaintiff experienced a stabbing pain in the right knee while shopping. A stabbing pain in the left knee followed, and the pain subsequently went to all of her joints. A rash rapidly developed which covered 70 percent of her body. When she got home she was unable to bend her knees to get into the bathtub; she suffered severe pain all night and in the morning went to her employer, a physician, Dr. George Mills, who said she had some kind of serum sickness resulting from the swine flu vaccine.

Her condition continued to worsen and her fever rose to 102 degrees. On December 5, 1976, she was admitted to Oakwood Hospital, and remained there until January 29, 1977. Her symptoms, in addition to the

---

1. There had been a tremendous amount of publicity urging people to take the swine flu vaccination in the fall and early winter of 1976–77. Two exhibits of interest are plaintiff's Exhibit 21, which is a letter to all radio station managers from Theodore Cooper, M.D., Assistant Secretary of Health, urging them to publicize the swine flu and to call upon people to receive their shots. Of particular interest is the fourth paragraph in the letter, which says: "The influenza vaccine we are using has been tested more than any in the past. It is safe and effective and there is no reason to worry about it causing death or illness. There are few reactions to this vaccine. Most people won't have any after effects. Some may get a fever and a sore arm which won't last very long."

Plaintiff's Exhibit 25 is a statement by the President urging Congress to appropriate money for mass inoculation of the people and stating among other things, "Finally I am asking each and every American to make certain he or she receives an inoculation this fall. Inoculations are to be available at schools, hospitals, physicians' offices, and public health facilities. The reaction to the shot, I am told, may mean a few sore arms for a day or two—a very small price to pay for this vital protection."

pain, were a rash, spiking fever, sore throat, and limitation of motion of all major joints. Later she developed a heart murmur, anemia, and had protein and blood in her urine.

At Oakwood Hospital she was under the care of Dr. Edward M. Barbour, a board certified internist. In the hospital, her condition got progressively worse, and on her discharge on January 29, 1977, the diagnosis was acute rheumatoid arthritis (Still's Disease), suspected rheumatic fever, or fever of undetermined origin.

After her discharge, plaintiff was bedridden and unable to care for herself. Her condition remained unchanged until the summer of 1977, when she was admitted to Harper Hospital, Detroit, for further diagnostic studies by Dr. Barbour. During the period from her discharge from Oakwood Hospital in January until her admission to Harper Hospital in August, she remained totally immobile. She could do no housework, and had to stay in bed 90 percent of the time.

Mrs. Hasler was an inpatient at Harper Hospital from August 18, 1977, through August 25, 1977, when she was discharged with a diagnosis by Dr. Barbour of acute rheumatoid arthritis secondary to swine flu vaccination. This discharge diagnosis was concurred in by other attending physicians, including interns and residents on the staff at Harper Hospital.

Plaintiff had no hospitalization during 1978, but she was in bed most of the time and her condition worsened. Her sister and her mother took over all of her household chores and she was in constant pain. She had no outside activity.

In February of 1979, Mrs. Hasler was readmitted to Harper Hospital and was told that her right hip had completely deteriorated and would have to be replaced. She was discharged, and the next month, March 1979, returned to Harper Hospital for a total replacement of her right hip. The next year, in August 1980, she returned to the hospital and had a total left hip replacement.

At the time of trial, plaintiff testified that she spends 90 percent of her time in bed. She has been unable to return to work or to do the simplest household chores. She cannot properly care for her 11-year-old daughter. She faces the prospect of a joint replacement in her knees, and surgery on her hands and ankles. She has constant pain in her neck, back and shoulders. The rash and fever are persistent. Her family relationship has deteriorated terribly and life with her husband has drastically changed.

Mrs. Hasler was determined to be totally and permanently disabled by the Social Security Administration, which assigned the onset date of December 3, 1976 for her disability.

Mr. Hasler, who had been in excellent health prior to the illness of his wife, has developed ulcerative colitis, etiology unknown. His ulcerative colitis has been exacerbated by the condition of his wife.

I

In January of 1976, a number of cases of respiratory disease developed at Fort Dix, New Jersey, and the Center for Disease Control Virology Laboratory identified two of eight throat washings from Fort Dix as swine-like virus, type A/NJ/76. Investigation of the swine flu at Fort Dix revealed five patients in which the swine flu virus was isolated. A total of four cases of A/NJ/76 outside of Fort Dix were diagnosed by serological testing and/or by virus isolation in 1976 in the United States, and two cases were diagnosed in 1977. In February and March of 1976, surveys at Fort Dix were conducted. The Center for Disease Control conducted similar surveys in surrounding civilian populations to determine the spread of the swine flu virus. The survey results produced no recorded evidence of a community spread of swine flu from March 1976 through December 1976.

Throughout February and March 1976, various health officials from the Center of Disease Control began planning swine flu immunization programs aimed at inoculating the entire population. A meeting of

these officials and other distinguished medical persons was held at the White House in March 1976, with President Ford in attendance. Following this meeting, the President announced that he was recommending a mass vaccination program for all Americans. In this announcement, President Ford stated he would request the Congress to appropriate money so that every man, woman, and child could be vaccinated against the swine flu. The special appropriation was authorized by the Congress, and on April 15, 1976, President Ford signed the legislation appropriating $135,-000,000 for the Swine Flu Program.

On April 21, 1976, swine flu clinical trials began and a total of 7,590 subjects were enrolled. Field trials indicated that single doses of the vaccine did not work well on children, who had a number of reactions, including high fever. There was much discussion in Washington and elsewhere about the potential liability of drug manufacturers and insurance companies if there was to be mass immunization. Legislative hearings were held and many prominent physicians, including Dr. Albert Sabin and the Health Research Group, opposed the program. They proposed that the vaccine be manufactured and stored until there was evidence of a significant outbreak of the swine flu.

Liability issues were eventually resolved by the Government's assumption of liability for adverse reactions of the vaccine, and on August 12, 1976, President Ford signed into law "The National Swine Flu Immunization Program of 1976."

## II

Plaintiff relies upon both the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq. and the National Swine Flu Immunization Program Act of 1976, 42 U.S.C. § 247(b), (hereinafter the Swine Flu Act), to establish liability. However, this Court concludes that liability can be predicated upon the Swine Flu Act alone; therefore, it is not necessary to consider the Federal Tort Claims Act to arrive at a decision.

The Swine Flu Act has as one of its purposes the protection of "program participants'" liability. The Act establishes exclusive procedures for asserting claims against the United States and provides that the United States shall be liable "... for personal injury or death arising out of the administration of swine flu vaccine under the Swine Flu Program based upon the act or omission of a program participant." Program participant is defined to include manufacturers, distributors, public and private agencies or organizations, and medical and other health personnel.

■ The Statute further provides that the liability of the United States "may be based on any theory of liability that would govern an action against such program participants under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty." Thus the United States assumed full responsibility for any liability of a program participant. A program participant cannot be joined as a party defendant, nor can the United States implead one as a third party defendant for contribution or indemnity.

Many swine flu cases, including this one, were consolidated for pretrial purposes before Judge Gesell of the District Court of the District of Columbia as an MDL CASE. Judge Gesell entered a comprehensive pretrial order, in which he stated in significant part:

"... under the Swine Flu Act, the United States is a substitute defendant for program participants and is therefore liable to the same extent that a program participant would have been liable under the law of the State or locality where the act or omission occurred...."

On motion for summary judgment, Judge Gesell ruled that the following decisions may not be predicates for liability in swine flu cases:

A. The decision to establish a National Swine Flu Immunization Program;

B. The decision to suspend the Program on December 16, 1976, and the timing thereof;

C. The decision to resume the Program on a limited basis in February 1977.

The Court did hold, however, that the liability of the United States for personal injury or death arising from an act or omission of any program participant in the National Swine Flu Immunization Program shall be based upon the law applicable to private persons in the State where the injury occurred, and that possible theories of liability are negligence, breach of implied warranty, breach of express warranty, strict liability, or misrepresentation under ¶ 402B of the Restatement of Torts.

Plaintiff in the present case first contends that the defendant was negligent in the following ways: 1) manufacturing, promoting, and supplying the vaccine without adequate testing; 2) manufacturing, promoting, and selling a defectively designed and manufactured vaccine; 3) inoculating the public without adequate warnings; 4) failing to adequately and timely warn plaintiff of the risk/benefit analysis so that the plaintiff could properly weigh the risks and benefits; and 5) failing to properly and timely warn the medical profession and the public of the risk of danger associated with the swine flu inoculation.

Mrs. Hasler also claims she is entitled to recover on a theory of strict liability, alleging that the swine flu vaccine was defective and dangerous to use because of defective design and manufacture and/or inadequate warnings. She also claims breach of implied warranties of fitness and merchantability resulting in injury and damage to her, and breach of express warranties purportedly contained in labels and advertisements espousing the effectiveness and safety of the vaccine.

■ To resolve the liability issue, the Court must look to the law of Michigan governing negligence and strict liability, since by virtue of the MDL pretrial order the Government is liable for whatever conduct would have been actionable against a program participant under the law of the state or locality where the act or omission occurred.

In addition, the Swine Flu Act imposed a special statutorily created duty to "fully explain or warn," a departure from which is actionable. Under 42 U.S.C. § 247b(j)(1)(F), the Secretary of HEW was charged with the:

"... Development, and consultation with the National Committee for the Protection of Human Subjects of Biomedical and Behavioral Research and implementation of a written informed consent form and procedures for *assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such a vaccine is administered.*" (emphasis added).

Judge Gesell pointed out in his final pretrial order on page 2:

"Nothing in the Swine Flu Act itself bars the plaintiff from demonstrating that in a given situation a program participant as well as the United States had the duty to warn potential vaccinees."

Michigan law governing negligence and breach of implied warranty theories in warnings is set forth in the leading case of *Smith v. E. R. Squibb & Sons*, 405 Mich. 79, 273 N.W.2d 476 (1979). There the Michigan Supreme Court held that:

"A manufacturer of a prescription drug has a legal duty to warn the medical profession, not the patient, of any risks inherent in the use of the drug which the manufacturer knows or should know to exist ... however, this duty has been held to require warnings to the patient when the prescription drug is administered on a mass immunization program; e. g. *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (CA9 1968). Determination of whether the duty has been breached in the context of a negligence claim necessitates that the warnings given be examined as to their reasonableness under the circumstances." *Id.* at 88–89, 273 N.W.2d 476.

Speaking of breach of implied warranty, the Court stated:

"Breach of implied warranty, on the other hand is established when plaintiff proves that a product defect attributable

to the manufacturer has a causal relationship to the plaintiff's injuries... *It is commonly accepted that inadequate warnings alone can constitute a product defect, whether the theory be implied warranty or strict liability in tort... As noted by the Court below, it is also generally recognized 'that .... under the implied warranty theory, it is not necessary to prove negligence.'" Id.* at 89, 273 N.W.2d 476. (emphasis added).

The Court continued:

"However when the factual issue is not whether the product itself is defective, but whether the manufacturer has provided adequate warnings, the existence of a product defect and a breach of duty is determined by the same standard—reasonable care under the circumstances. In the context of a product liability case, it has been said that 'The standard by which a jury determines adequacy is a general negligence standard that liability is created by "conduct that falls below the standard established by the Law for the protection of others against unreasonably great risks of harm".... This is true because the focus is upon the *adequacy* of the warnings regardless of the theory of liability.'" *Id.* at 90, 273 N.W.2d 476.

*Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (CA9 1968) cited by the Michigan Supreme Court in *Smith v. Squibb*, supra, involved a 1963 mass immunization program begun by the Idaho Falls Medical Society for poliomyelitis. The Court pointed out that under any theory, breach of implied warranty, strict liability or negligence, liability is avoided only in those situations where the sale is accompanied by proper directions or proper warnings. The Court set forth a balancing test. Where a risk is very minor because there is only an extreme improbability that anything will happen, a warning is not necessary, but in *Davis* the Court rejected Wyeth's contention that the one in a million possibility of a reaction from a vaccine was so minor as so not to create a duty to warn. The Court said:

"When, in a particular case, the risk qualitatively (e. g. of death or major disability) as well as quantitatively, on balance with the ends sought to be achieved, is such as to call for a true choice judgment, medical or personal, the warning must be given." *Id.* at 129, 130.

■ It is therefore clear under Michigan law that a manufacturer has a duty to warn of dangers which he knew of or reasonably should have known of, and that the failure to do so constitutes not only negligence but breach of implied warranty, and imposes strict liability.

■ In this case, the warnings given to the plaintiff were minimal. She was told by the person administering the shot only that she might have a sore arm. The written warning (Defendant's Exhibit 30) stated that "Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people may also have fever, chills, headaches or muscle aches within the first 48 hours." A general disclaimer suggested that with any vaccine or drug the possibility of severe or potentially fatal reaction exists.

In addition, there were inserts in the packages of vaccine which went to physicians, warning of possible neurological injuries. Such warnings were not given to the plaintiff or any recipient of the vaccine, and it is clear from the Government's subsequent admission of liability in cases involving Guillain-Barre Syndrome that there were potential neurological dangers in the vaccine that were not made part of the warning.

The warnings given in this case were so bland that no reasonable person would consider him or herself to be in any danger whatever from taking the drug. In fact, the warning given to plaintiff personally was decidedly "upbeat" and certainly not sufficient to avoid liability for either breach of warranty or negligence.

■ Moreover, the consent form which Kathleen Hasler signed prior to getting the shot did not adequately advise her of the

possible risks of the vaccine so as to constitute "informed" consent.

In *Petty v. United States*, No. C 78–4083, United States District Court for the Northern District of Iowa, Judge O'Brien found the Government liable and negligent for failure to provide a satisfactory, informed consent form as required by the Swine Flu Act.

The Court criticized the consent form, stating:

"A careful look at the required 'informed consent form' . . . shows that it is hardly that. First of all it's called 'registration form'; nowhere do the words 'informed consent' or 'consent' appear. The individual is not advised with respect to his 'rights and remedies' which may arise out of the administration of the vaccine."

The language of that opinion is especially significant when one looks at the identical form signed by plaintiff herein. It is entitled "Registration Form." Attached to it is a form called "Important Information about Swine Influenza 'flu' Vaccine, 'Monovalent'," on the back of which it says: "These vaccines have been field tested and shown to produce very few side effects. Some people who received the vaccine had fever and soreness during the first day or two after vaccination. These tests and past experience with other flu vaccines indicate that anything more severe than this would be highly unlikely."

"As indicated, some individuals will develop fever and soreness after vaccination. If you have more severe symptoms or if you have fever which lasts longer than a couple of days after vaccination, please consult your doctor or a health worker wherever you receive medical care.

"While there is no reason to expect more serious reaction to this flu vaccination, persons who believe they have been injured by this vaccination may have a claim . . ."

This Court can only conclude that informed consent was not an element of the "registration form" signed by the plaintiff here. Looking beyond the disparity between the title of the form and its claimed purpose, and the total absence of the term "informed consent" from the text, the contents of the form do not educate or advise the prospective vaccinee, but merely speculate as to the possible risks. The rights and remedies arising as a consequence of assuming these risks are never discussed. It simply cannot be said that plaintiff was provided with enough information as to the risks, rights, and liabilities to permit her to make an informed judgment prior to receiving the vaccine.

It is therefore clear that, as a matter of fact, the Government, under the Michigan law of either negligence, implied warranty or strict liability, breached its duty of providing adequate warning of the possible potential dangers of the vaccine to its recipients. Liability is thus established in this case.

### III

█ The most difficult and significant issue in this case, and the one on which most trial time was spent is that of causation. That the Government was negligent or breached its implied warranty is clear. The question of causation is not so easily resolved.

Three physicians testified for the plaintiff that there was a causal connection between the injection of the swine flu shot and the crippling disease of plaintiff.

Dr. Edmund Barbour was plaintiff's treating physician. He is a board certified internist specializing in gastroenterology. He is head of the Department of Gastroenterology at Oakwood Hospital in Detroit, and Assistant Head of the Department of Gastroenterology at Harper Hospital in Detroit. He is also Assistant Professor of Clinical Medicine at Wayne State University.

Dr. William McDonald, an associate of Dr. Barbour's, is a rheumatologist who saw plaintiff on a few occasions. He is board eligible (but not board certified) in rheumatology and has been practicing in the field of rheumatology for many years.

Dr. Anthony Sliwinski is board certified in internal medicine and rheumatology, and is head of Rheumatology at the Georgetown University Hospital in Washington, D.C.

All three are well qualified physicians, and all three found a causal connection between plaintiff's problem and the swine flu vaccine.

Defendant presented four equally well qualified physicians: Dr. Philip Frost, a board certified immunologist and Ph. D. in immunology, who consulted with Dr. Barbour; Dr. John Sigler, board certified in internal medicine, and Chief of the Department of Rheumatology at the Henry Ford Hospital; Dr. Ralph Cushing, Associate Professor of Medicine at Wayne State University and Chairman of the Department of Medicine, and Dr. Felix Fernandez-Madrid, Chief of the Rheumatology Section at Harper Hospital and Chief of Rheumatology and Clinical Immunology at the Wayne State University Medical School.

All defense physicians diagnosed Mrs. Hasler's condition as Still's Disease or juvenile rheumatoid arthritis. They said she met a sufficient number of the criteria of the American Rheumatology Association to have rheumatoid arthritis. Although the defendant's doctors testified that the cause of Still's Disease and adult rheumatoid arthritis is unknown, they nevertheless opined that the swine flu vaccine had nothing whatever to do with plaintiff's illness.

The task of the Court in weighing the testimony of these physicians, all of whom are competent and reputable, is a difficult one.

Dr. Barbour justified his conclusion that the swine flu vaccine caused plaintiff's condition by saying it was a delayed immunological response secondary to a swine flu injection. He stated that this was his opinion to a reasonable medical certainty, noting that antibody reactions can cause the kind of reaction Mrs. Hasler had here. Dr. Barbour reached this diagnosis only after excluding everything else. He said a review of her history and a review of her medical progress and records showed he was faced with an immunological response.

He said it took him about a year to come to this conclusion, because he wanted to eliminate every other possibility. His final opinion was that plaintiff's disorder was not rheumatoid arthritis, but a rheumatoid-like disorder arising as an immunological response to a swine flu shot. Dr. Barbour said that, in addition to all of the symptoms of rheumatoid arthritis, plaintiff had a heart murmur, kidney involvement, skin rash and anemia. He said none of these occur in normal rheumatoid arthritis. Dr. McDonald and Dr. Sliwinski supported Dr. Barbour's diagnosis.

Dr. Sliwinski found that plaintiff had an auto-immune reaction in her body, characterized by fever and arthritis. There was skin involvement and evidence of kidney involvement. He pointed out that Mrs. Hasler had a unique set of problems, and many things were happening to her that one would not expect to find in adult onset of juvenile rheumatoid arthritis (Still's Disease). He emphasized that the typical onset of rheumatoid arthritis does not have fever and skin rash, or red blood cells in the urine. He opined that the most likely cause of her difficulty was the swine flu vaccine, because she was perfectly normal before the shot, was given an immunogen, and now has an immunological disease.

On the other hand, Dr. Frost, an immunologist, testified that he did not believe that the swine flu vaccine could cause Still's Disease, but he stated on the other hand that he could not say that it did not. He said plaintiff had rheumatoid arthritis arising from Still's Disease (juvenile rheumatoid arthritis) and that medicine did not know the cause for such disease. He opined that the swine flu vaccine did not cause Mrs. Hasler's arthritis, that there are no reports in the literature of any swine flu arthritis cases, and that the opinions of Dr. Sliwinski, Dr. Barbour and Dr. McDonald were pure speculation. On cross examination, Dr. Frost admitted that in the study of cases in which swine flu shots were given to people with arthritis, seven of 13 cases had exacerbations after receiving the swine flu shot, but he testified that this is not un-

usual because arthritis cases get worse and get better.

Dr. Sigler generally concurred with Dr. Frost, but admitted that some people claim that an antigen-antibody response can cause rheumatoid arthritis. He did not concede that himself.

Dr. Cushing opined that the swine flu shot did not cause plaintiff's rheumatoid arthritis. He said no one knows the cause of rheumatoid arthritis but that there is nothing in the literature to show that swine flu shots could cause rheumatoid arthritis. He did concede, however, that rheumatoid arthritis and Still's Disease sometimes can be caused by an auto-immune reaction, and that rheumatoid arthritis and Still's Disease can be the result of antigen-antibody reactions. He nevertheless contended that the swine flu injection had nothing to do with the sudden onset of plaintiff's condition.

Dr. Fernandez-Madrid supported other defense doctors, testifying that there is no showing that the swine flu shot could cause or did cause or exacerbate rheumatoid arthritis.[2]

Several things impress the Court and impel a conclusion that the plaintiff has carried her burden by a fair preponderance of the evidence by showing that the swine flu shot did indeed cause her arthritis.

First of all, the onset of the disease was within the time limits for such type of immunological reaction. Temporally the reaction started in "text book manner." This was agreed to by all physicians.

Secondly, plaintiff's reaction was a typical antibody and immunological response which usually develops seven to 10 days after a shot is given.

Third, tests given upon admission to the hospital were all normal, but subsequently there was a high spiking fever, rash, anemia, heart murmur, and an inflammatory process throughout the entire body. More-

over, every physician agreed that rheumatoid arthritis can be related to an antibody antigen reaction.

Finally, the negative health history of plaintiff and her family are significant to the conclusion that the swine flu shot was the causative factor of plaintiff's disease.

In view of the fact that there were symptoms other than those found in the normal case of Still's Disease, namely rash, anemia, heart murmur, protein and blood in the urine, and because rheumatoid arthritis can result from an antibody antigen reaction and there was no significant medical history related to rheumatoid arthritis, it is reasonable for this Court to find as a matter of fact that the swine flu shot was the cause of plaintiff's rheumatoid arthritis. This is especially true in view of the temporal relationship—the sudden onset of the disease ten days after the swine flu shot—a fact which cannot be regarded by this Court as mere coincidence.

The Court therefore finds that the United States Government must respond in damages.

## IV

Now—the consideration of damages. Mrs. Hasler has already incurred $43,000 in medical expenses, and Dr. Barbour testified that her condition will get progressively worse. Plaintiff faces further hip replacements, a knee replacement, and surgery on her hands and ankles. Dr. Barbour stated, without contradiction, that she will require seven to eight hospitalizations in the future, and that each hospitalization will cost between six and ten thousand dollars. Therefore she will have future hospital expenses of from $42,000 to $80,000, in addition to her expenditures of $43,000 to date.

The only expert witness on damages was James Gifford, an economist, who testified

---

2. All physicians who testified for the defense said they didn't know the cause of Still's disease or rheumatoid arthritis, but that the swine flu vaccine did not cause them.

Their syllogism seems to be:
1. Plaintiff has rheumatoid arthritis.

2. No one knows the cause of rheumatoid arthritis.

Therefore: Swine flu vaccine cannot cause rheumatoid arthritis. The syllogism speaks for itself.

for plaintiff. He offered, and the Court received, Plaintiff's Exhibit 28, which was an economic analysis of plaintiff's loss of income and loss of the value of household work. His unrefuted calculations, which were adjusted for inflation and for interest rates, showed a loss of $811,340 until age 65.

Plaintiff has already been determined by the Social Security Administration to be totally and completely disabled, and all medical testimony is unanimous as to her disability. No one claims that she will ever be able to work again, nor does anyone claim she will ever be able to do reasonable housework.

In addition to the medical expenses and wage and household losses outlined above, the Court must assess a reasonable figure for the pain and suffering she has endured, for her disability, and for the complete change of lifestyle which she has suffered and will continue to suffer for the rest of her life. These intangibles are difficult to determine. But considering the actual wage and medical losses, the Court feels that a reasonable judgment for plaintiff Kathleen Hasler against the United States Government is one million, five hundred thousand dollars ($1,500,000) and will order judgment for that amount against the Government of the United States.

 With reference to Mr. Hasler, his testimony indicated that the marriage was never the same after the illness, that no longer can they do the things that they used to do as husband and wife. In addition, Dr. Barbour testified that Mr. Hasler has ulcerative colitis, and that, although the etiology of ulcerative colitis is unknown, it is medically established that stress aggravates ulcerative colitis. The ulcerative colitis is under good control at the moment, but it could flair up.

Considering all of these factors, the Court determines that a reasonable award on a derivative basis to plaintiff Michael Hasler is fifty thousand dollars ($50,000).

This opinion shall constitute the findings of fact and conclusions of law required by F.R.C.P. 52(a).

Plaintiffs may present judgments, add interest, and tax costs.