**Valerie BORUSKI, Plaintiff-Appellant,**

v.

**The UNITED STATES of America, Merck, Sharp and Dohme Company, and the City of Chicago, a Municipal Corporation, Defendants-Appellees.**

No. 85–2847.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1986.

Decided Oct. 10, 1986.

---

Stephen A. Snakard, McCarthy, Duffy, Neidhart & Snakard, Chicago, Ill., for plaintiff-appellant.

Maureen Kelly, Corp. Counsel Robert Marc Chemers, Pretzel & Stouffer, Michael S. O'Connell, Linda Wawzenski, Dep. Chief, Civ. Div., U.S. Atty's Office, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, WOOD, Circuit Judge, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

The district court granted summary judgment in favor of defendants on all four counts of plaintiff's complaint alleging personal injury resulting from a vaccination she received as part of a flu immunization program in which all three defendants, the United States, the City of Chicago ("the City"), and Merck, Sharp and Dohme Company ("Merck") (the manufacturer of the vaccine), had some part. Plaintiff appeals claiming the district court ignored genuine issues of material fact and certain of plaintiff's alleged theories.

## I.

### Factual Background

Pursuant to section 317 of the Public Health Service Act, 42 U.S.C. § 247b, the United States promoted a grant program during 1979–80 to assist local governmental agencies, including the City of Chicago, in immunizing persons sixty-five years of age and older, or other high risk persons, against influenza. The plaintiff alleges that the United States authorized, commissioned, and procured the vaccine from the defendant Merck. The United States purchased the vaccine which was then shipped to the City of Chicago to be administered as part of the program.

Plaintiff, a resident of Chicago, then seventy-one years of age, received the flu vaccination from a city employee at the Daley Center on November 19, 1979. Thereafter on November 23, 1979, plaintiff first consulted a doctor, and on December 29 her illness was diagnosed as being Guillain-Barre Syndrome ("GBS"), a paralytic and degenerative condition of the nervous system.

Before being administered the flu shot, plaintiff had been presented with a form prepared and distributed by the United States pursuant to its contract with the vaccine manufacturer, Merck, to warn potential users about the vaccine's risks. That form, complete on one side of legal-size paper, is captioned in boldface capital letters "IMPORTANT INFORMATION ABOUT INFLUENZA AND INFLUENZA VACCINE, 1979–80," and just underneath, as part of the caption, but in smaller print, is the admonition to "Please read this carefully." The content of the form is separated in two parallel columns with boldface paragraph subheadings. The left-hand column explains what influenza is, what the vaccine is, and how it is administered, the dosage, and who should consider being vaccinated. It is the right-hand column, however, which is at issue.

At the top of the right-hand column just under the main caption is the boldface paragraph title "POSSIBLE SIDE EFFECTS FROM THE VACCINE." [1] Among

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. That paragraph follows in full:
POSSIBLE SIDE EFFECTS FROM THE VACCINE: Most people have had no side effects from recent influenza vaccines, although some complained of a sore arm for 2–4 days. Fever, chills, headaches, and muscle aches have occurred in less than 4 percent of recipients. As is true with any vaccine or drug, there is a possibility that allergic or more serious reactions, or even death, could occur. In 1976, about 12 of every 1 million adults who received swine influenza vaccine developed a paralytic condition called the Guillain-Barre Syndrome (GBS) within 10 weeks of vaccination. (Very little information is available on the risk of GBS following influenza vaccination for persons under age 18). GBS also occurred in about 2 out of every 1 million adults who did not get swine influenza vaccine. Most people who get GBS can be expected to recover; 5–10 percent may have some permanent paralysis; and 5–6 percent may die. In 1976, there was an average of 1 death from GBS for every 1.8 million people vaccinated; GBS deaths among vaccinees over age 65 were higher—about 2 for every 1.8 million people vaccinated.
Most information concerning the risk of GBS following influenza vaccination was gathered in 1976. Studies in 1978–79 did not show an increased risk of GBS in persons who received influenza vaccine. However, it is possible that the risk of GBS which was observed in 1976 may be present for other influenza vaccines. Any risk of GBS should be balanced against the much higher risk of compli-

other things, the paragraph points out that although fewer than four percent experience more than a sore-arm reaction for a few days there is the possibility that allergic or more serious reactions or even death could occur. The paragraph then confronts the very disease that plaintiff claims to have contracted from the vaccine. In 1976, the form reveals, about twelve out of every one million adults who received the vaccine developed within ten weeks of vaccination a paralytic condition called the Guillain-Barre Syndrome. GBS is then discussed in more detail. The greater part of the paragraph is in fact devoted to the very ailment plaintiff blames on the vaccine. Other types of neurological illnesses are also mentioned as possibilities.

Across the bottom three inches of the form, directly underneath the preceding two-column information section is an instruction for the recipient to keep the upper, informational part of the form for that person's own records. A horizontal dotted line follows suggesting the form be separated there, the lower part to be completed by the person to be vaccinated and retained by the city. It contains a statement in italics that the person has read the preceding information on the form, has had the chance to ask questions, and has received satisfactory answers. It then states that the person understands the benefits and risks of the vaccine and requests that it be given.[2] Following that the recipient is to print his or her name, age, and address, and then sign the form. The plaintiff fully and properly completed the form.

Plaintiff now endeavors to minimize the significance of her receipt of the information sheet and her signature on the statement indicating that she had read and un-derstood it. In her deposition and answers to interrogatories she claims that the information sheet was given to her by a city employee who told her to "scan it" and sign her name, but who offered no information about the vaccine or its risks. There was a long line waiting for the vaccination, she explains, and it was moving quickly. A city employee was, as characterized by plaintiff, pushing people along. Plaintiff says she scanned only a little part of the form and recalls reading only the first paragraph, and did not read the paragraph about possible side effects. However, in her deposition she ultimately responded, "To tell you the truth, I don't remember how much I read." She later stated, "I don't remember if I read it or not."

Thereafter plaintiff filed a four-count complaint against the three defendants jointly and severally seeking $750,000 in damages. Count I is based on strict liability in tort alleging the vaccine was unreasonably dangerous and unsafe. Count II alleges a breach of implied warranty of fitness for the particular purpose and Count III alleges a breach of implied warranty of merchantability, both based upon the Illinois Uniform Commercial Code. Ill. Rev.Stat. ch. 26, §§ 2–314, 2–315 (1985). Count IV is based on negligence in the manufacture, sale, marketing, promotion, distribution and administration of the vaccine.

## II.

### Consideration by the District Court

The United States filed a motion to dismiss arguing that Counts I through III were barred because the United States had not waived its sovereign immunity under

---

cations (including death) from influenza for the chronically ill and the elderly during influenza epidemics.

Other illnesses, including other neurological illnesses, have been reported among people after they received influenza vaccine, but a relationship between the vaccination and the illness has not been established.

2. The statement in full follows:
   I have read the information on this form about *influenza* and *influenza vaccine*. I have had a chance to ask questions which were answered to my satisfaction. I believe I understand the benefits and risks of influenza vaccine and request that it be given to me or to the person named below for whom I am authorized to make this request.

the Federal Tort Claims Act ("FTCA")[3] for actions grounded on strict liability and implied warranties. Count IV was challenged by the government on the basis that it was barred by the discretionary function exception to the FTCA and failed to state a claim. The district court held that it had no subject matter jurisdiction on Counts I through III, but denied the government's motion as to Count IV. The district court likewise denied motions to dismiss by the City and Merck. Subsequently both the United States and Merck filed motions for summary judgment. These motions were allowed and the suit dismissed. The district court on its own motion included the City in the motions for summary judgment and likewise dismissed the suit as to the City.

The trial court concluded that adequate disclosure of the risks had been made to plaintiff, and therefore found that it was unnecessary to consider the other defense theories. The court viewed the underlying premise of all the counts as alleging the failure of the defendants to provide adequate disclosure concerning the risks of injury from the use of the vaccine. Considering the contents of the information form and plaintiff's signed statement at the bottom of the form in which she acknowledged she understood the risks, the district court found no material question of fact to be resolved as to what a reasonable medical practitioner would have disclosed, citing *Green v. Hussey*, 127 Ill.App.2d 174, 183, 262 N.E.2d 156, 161 (2d Dist.1970) and *Guebard v. Jabaay*, 117 Ill.App.3d 1, 72 Ill.Dec. 498, 452 N.E.2d 751 (2d Dist.1983). The thrust of plaintiff's argument to the district court was not that a reasonable medical practitioner would have disclosed more, but that a material question of fact existed as to whether the disclosures in the information form were meaningful and understandable. The court viewed that argument as being fully met as a matter of law by the language of the form itself clearly stating the risks, by plaintiff's admission that she only scanned the form, and by her

signed consent which stated she had read and understood the risks.

Plaintiff, on appeal, contests the trial court's characterization of the complaint as being premised only on inadequate disclosure, and claims that by doing so the district court ignored the other grounds upon which the counts were premised, as well as the other defense theories raised by the defendants in opposition. It was error, plaintiff claims, to so neatly and conveniently dispose of this whole case.

## III.

### Analysis

The plaintiff does not contend that there was not disclosure, but claims that it was not meaningful and understandable in the mass-immunization context. Plaintiff cites *Petty v. United States*, 740 F.2d 1428 (8th Cir.1984), *Hasler v. United States*, 517 F.Supp. 1262 (E.D.Mich.1981), *rev'd*, 718 F.2d 202 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984), and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), to support her theory that "scanning" the information sheet, as she characterizes her actions, neither bars recovery nor precludes further inquiry into the adequacy of the disclosures and the validity of plaintiff's purported consent.

*Petty* was decided under Iowa, not Illinois, law. 740 F.2d at 1431. The information form warning in *Petty* was found not to encompass the specific known and material risk of the serum sickness necessary to provide the *Petty* plaintiff with adequate information to make an intelligent decision. In that case the plaintiff was not warned of the possibility that she could contract the serum sickness which she in fact contracted. *Id.* at 1437. In the present case, in contrast, the very illness which plaintiff claims resulted from the vaccination was the particular subject of the larger portion of the risk section of the information sheet.

---

**3.** Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

In *Hasler* the district court criticized the information form given in a flu program and the government was held liable for failure to disclose the risk of getting the particular disease contracted by that plaintiff from the vaccine. 517 F.Supp. at 1268–69. However, as the government points out, that case was reversed on appeal, *see* 718 F.2d 202 (6th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984), on the basis that, under Michigan law, there was no causation shown between the vaccination and the disease which the plaintiff contracted. 718 F.2d at 206. The court did not discuss the proposition for which *Hasler* is cited by plaintiff in the present case.

In *Reyes* a mother took her infant daughter to a public health clinic to be administered oral polio vaccine, and sickness resulted. 498 F.2d at 1270. *Reyes,* decided under Texas law, is distinguishable because the form signed by the mother which released the State of Texas from all liability contained no warning whatsoever about the risks even had the mother read and understood the form, which was in doubt. *Id.* at 1278–79.

In Illinois a physician or health care provider has a duty to disclose to a patient those risks which are foreseeable. *See Magana v. Elie,* 108 Ill.App.3d 1028, 64 Ill.Dec. 511, 439 N.E.2d 1319, 1321 (1982). The information sheet met that standard as a matter of law in the particular circumstances of this case. The plaintiff admittedly scanned the information sheet to some unascertained extent, but does not and cannot contend that she relied on the warnings which she now claims to have been defective in some way. She claims not to have been aware of the risks. However, had she read what the form says about risks and the particular disease she claims to have contracted, she would have found the form clearly sufficient in its warning for her to make her own personal decision about whether or not to be vaccinated. That was the very purpose of the form. Unfortunately, plaintiff may have been among that very minimal percentage of those who contract GBS from the influenza vaccine, but the form clearly warned of that risk.

Plaintiff argues further that, given the particular immunization setting in the Daley Center, there remains a material question of fact whether under those circumstances she was adequately informed of the exact risk. The adequacy of the disclosure, however, is irrelevant if the plaintiff, as here claimed, did not read the paragraph devoted to warning of the risks. She could not have relied to her detriment one way or the other on the information or lack of information in the form if she did not read it, or at least that part of it. *See Callas v. United States,* 682 F.2d 613, 623 (7th Cir. 1982) (reliance necessary to establish that alleged negligence caused the injury). If the plaintiff complains that the rushed atmosphere at the Daley Center did not give her adequate opportunity to read the form or ask questions, she had no more to do than to step out of line until she was ready to get back in again, or to go back home, think about it further, or consult her personal physician. It is unrealistic to expect the defendants in this situation to have done more than was done in this type of a public health effort.

Plaintiff was not misled in any way. An adult who is under no disability should be expected to assume some personal responsibility in a situation such as this and not try to turn public employees, who are there to serve the public, into conservators for each person who comes for the program's benefits. Plaintiff refers us to *Unthank v. United States,* 732 F.2d 1517 (10th Cir. 1984), in arguing that people who hurriedly sign a standardized form are not adequately informed of the risks. *Unthank* is not a case, however, where the plaintiff felt too rushed to understand the form. In *Unthank,* the court considered the 1976 flu program, not the program involved here, and took into account the "barrage of publicity aimed at overcoming the reluctance of citizens to participate including the unprecedented appearance of the President of the United States on national television to

plead for a positive response." *Id.* at 1521 (noting that the setting was "so extraordinary that other cases can provide no real precedent"). That is the broad background in *Unthank*, a background not involved in the present case. Moreover, in *Unthank* the government conceded that the particular consent form involved was inadequate. *Id.*

Plaintiff also cites *Guebard v. Jabaay, supra,* for the proposition that a determination of adequate disclosure requires expert evidence. The district court concluded in the factual context of this case that no expert assistance was needed to interpret the form's language which set forth the specific disease information and which also contained plaintiff's signed acknowledgment and consent. It could be taken at face value. Plaintiff did seek to offer an expert to interpret the adequacy of the form's language, but failed to do so in affidavit form. Affidavit or not, the risk language of the form, if plaintiff did bother to read it at all, or if she only scanned it, is clearly adequate for any adult who does not claim to be illiterate. The language is not technical language extracted from some medical journal intended only for doctors, but very plainly in simple English warns in bold type that there are possible side effects. Included in the detailed explanation which follows is the possibility of death, and in particular the possibility of contracting the paralytic condition GBS which plaintiff claims to have suffered. A material-fact issue cannot be manufactured by an expert out of the plain language of the information form in this case. We consider the district court to be correct on that issue and to have properly disposed of it as a matter of law.

■ The district court, stopping there, did not consider the additional claims and theories of either the plaintiff or defendants. Since the additional items can also be disposed of as a matter of law, we will resolve them here for a more complete consideration of the case without the necessity of a remand to the district court. We may affirm the grant of a summary judgment motion on additional grounds as well as the particular ground advanced by the district court. *Over the Road Drivers, Inc. v. Transport Insurance Co.,* 637 F.2d 816, 818 & n. 2 (1st Cir.1980) (citing 10 Wright, Miller and Kane, *Federal Practice and Procedure* § 2716, at 240).

Plaintiff questions whether the consent form, which plaintiff says is a misnomer, was valid. The basis of the objection seems to be that the information form language using the phrase "possible side effects" does not convey clearly that there are in fact risks. Plaintiff says the warnings are too diluted by references to the infrequency of serious side effects to have any impact. Plaintiff, in effect, is arguing that the form's language ought to be so strong, regardless of medical experience, as to frighten people from receiving the beneficial aspects of the program. The language which was used is straightforward and clearly adequate, not too long, not too short. To add to plaintiff's argument that the information was inadequate plaintiff argues that even the government must have considered it inadequate or it would not have invited questions. If the invitation to ask questions had not been extended explicitly in the form to those who chose to read the form, the argument on the other side of the coin would no doubt have then been raised that questions were not encouraged or permitted, but should have been. Even for those such as plaintiff who did not choose to read the form, no one claims that anything suggested that questions were not welcome. Plaintiff not only chose not to read the form despite certifying that she had, but she also chose not to ask questions.

Plaintiff also contends that the bottom part of the form is not arranged in such a way as to constitute a consent, but rather only provides information about the person to receive the vaccine. The language above plaintiff's signature, and that below the dotted line, is italicized in ordinary-size print and begins "I have read the information on this form, etc." *See supra* note 2 (quoting the full statement). Those brief

two sentences are more than a personal acknowledgment by the undersigned of being informed and giving consent. It specifically is a "request" that the person signing be given the vaccine. There is little about the information form which satisfies plaintiff, but such arguments do not create genuine issues of material fact when the unambiguous facts are already clearly visible to an ordinary person, to the district court, and to this court.

Plaintiff then argues that if this court determines that the trial court was correct in deciding the issue of adequate disclosure, that we should still not dispose of the alternate grounds of liability asserted by plaintiff in the complaint. We shall for that purpose briefly examine the defendants' additional valid defenses to those other alleged grounds.

The United States defends the grant of summary judgment on the basis that the vaccine plaintiff received met all requisite Federal Drug Administration testing and licensing requirements, as shown by the affidavits of two high ranking doctors involved with the program. Dr. Hinman, Director of the Immunization Division of the Center for Prevention Services, Centers for Disease Control, Public Health Service, Department of Health and Human Services, stated under oath that the particular lot of vaccine used was inspected by the Bureau of Biologics of the Food and Drug Administration and passed the regulation requirements. Dr. Parkman's affidavit stated that he is the Scientific Director of the combined Bureaus of Drugs and Biologics, Food and Drug Administration, United States Department of Health and Human Services, and explained the licensing requirements for the vaccine and the testing that each lot of vaccine had to endure. Dr. Parkman then stated that the lot in question passed all tests and met all applicable standards.

■ The government affidavits are unrefuted except for a paragraph in an unverified memorandum of plaintiff's filed in the district court informing the court of three experts plaintiff would expect to call to testify as to the manner in which the government employees and agency were negligent. That expectation, plaintiff claims, creates a genuine issue of material fact. When questioned by the government in interrogatories for something specific about these negligence claims, plaintiff's response · was only "investigation continuing." The government affidavits are therefore uncontradicted. Plaintiff did not meet the requirements of defeating summary judgment with counter-affidavits or other competent evidentiary material. Reliance on the allegations in the pleadings is not enough. *See Faulkner v. Baldwin Piano and Organ Co.*, 561 F.2d 677, 683 (7th Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). Mere speculation and hope that additional discovery may possibly develop evidence showing a material issue of fact cannot defeat summary judgment in the face of adequate contrary affidavits. *Over the Road Drivers*, 637 F.2d at 820.

The United States also questioned the district court's jurisdiction, arguing that the United States is immune from suit for the actions of its employees which fall within the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a).[4] The plaintiff fails to allege the specific negligent act performance by the government in any of its particular tasks in the program. Even if more than a broad general allegation had been made by the plaintiff, however, the government's conduct would fall within the discretionary function exception which excepts acts of

---

4. Section 2680 provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

discretion in the performance of governmental functions or duty, irrespective of any negligence or abuse of discretion.

■ *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), illuminates that exception. *Dalehite* was a wrongful death action arising from the explosion of a certain type of fertilizer produced and distributed in accordance with the specifications and under the control of the United States. The Court found in the legislative history clear indications that the FTCA was not intended to test the legality of legislation or of regulations, or the propriety of a discretionary administrative act, through a tort damage suit. 346 U.S. at 30, 73 S.Ct. at 965. The Court found the FTCA excepted from tort liability acts of discretion in the performance of governmental functions or duties even if that exercise of discretion was abused. Employees exercising discretion, as well as the government agencies themselves, are immune. 346 U.S. at 33, 73 S.Ct. at 966. It cannot be argued that the government, through the Federal Drug Administration's administration of the congressional program challenged in this case, was exercising other than a governmental discretionary function. In the present case, as in *Dalehite*, the technical decision-making, consistent with specifications and directions of the established immunization plan as outlined by the government officials' affidavits, is not actionable under the FTCA.

More recently the Supreme Court has decided *United States v. S.A. Empresa De Viacao Aerea Rio Grandense, (Varig Airlines)* and its companion case *United States v. United Scottish Insurance Co., (United Scottish)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Both cases involved airplane crashes which were blamed by plaintiffs on the negligence of the Federal Aviation Administration in inspecting and certifying aircraft. These functions were held to be exempt under the FTCA's discretionary function exemption. *Id.* at 821, 104 S.Ct. at 2769. The Supreme Court also taught this court something

about the discretionary function exemption in *United States v. Hylin*, 469 U.S. 807, 105 S.Ct. 65, 83 L.Ed.2d 16 (1984) (remanding 715 F.2d 1206 (7th Cir.1983) for further consideration in light of *S.A. Empresa*), instructing that negligence in the implementation and enforcement of mandatory federal mine safety regulations was immunized under the discretionary function exception. On remand the discretionary function exception was recognized. 755 F.2d 551 (7th Cir.1985). For the various reasons discussed above, we affirm the district court's decision to grant summary judgment for the United States.

Merck, in defense of its successful summary judgment, also argues that the plaintiff had the opportunity to be fully informed about the possible side effects. We have already resolved that issue favorably for the government, and we do so likewise for Merck.

Merck not only maintains that the warnings were adequate, but argues that if there was any defect or inadequacy in the warning, which we do not find, that any deficiency should be attributed solely to the government. Pursuant to section 317(j)(1)(F) of the Swine Flu Act, 42 U.S.C. § 247b(j)(1)(F), the Secretary was authorized to develop and implement a written informed consent. The statute placed the duty to warn on the government. In addition, pursuant to the contract between the government and Merck, the government agreed to take all appropriate steps to provide each person to be vaccinated with meaningful warnings relating to the risk and benefits of the vaccination in understandable form and language. Merck has the benefit of this additional defense.

Merck further claims a complete defense to all of plaintiff's allegations based upon the so-called government contract defense which would apply regardless of the theory of liability. *Bynum v. General Motors Corp.*, 599 F.Supp. 155, 158 (N.D.Miss. 1984), *aff'd sub nom. Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir.1985). The defense is recognized in Illinois. In *Hunt v. Blasius*, 55 Ill.App.3d 14, 12 Ill.Dec. 813,

370 N.E.2d 617, 621–23 (4th Dist.1977), *aff'd on other grounds*, 74 Ill.2d 203, 23 Ill.Dec. 574, 384 N.E.2d 368 (1978), a case involving personal injury resulting from the construction of a highway sign for the State of Illinois, it was held that an independent contractor, such as Merck, owes no duty to third persons to pass judgment on the plan's specifications which he has merely contracted to follow. There is no resulting liability if the specifications, faulty though they may be, are thereafter carefully carried out.

The common application of the doctrine has been in military cases. *See, e.g., McKay v. Rockwell International Corp.*, 704 F.2d 444 (9th Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). The application to civilian relationships, however, is well-stated in *Burgess v. Colorado Serum Co.*, 772 F.2d 844 (11th Cir.1985), where the court said:

> Although most recent decisions refer to the defense as being available to "military" contracts, "[t]he rationale behind the defense is an extension of sovereign immunity: in circumstances in which the government would not be liable, private contractors who act pursuant to government directives should not be liable." *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036 (5th Cir.1984, *en banc*), *cert. denied*, 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985). Both the history of the defense and its general rationale lead us to the conclusion that it would be illogical to limit the availability of the defense solely to "military" contractors. If a contractor has acted in the sovereign's stead and can prove the elements of the defense, then he should not be denied the extension of sovereign immunity that is the government contract defense.

*Id.* at 846.

■ The government-contract doctrine can be applied in the circumstances of this case because there are no genuine issues of material fact to be resolved. The government is not liable and neither is its contrac-

tor Merck. Merck is entitled to rely on this defense as well. We affirm summary judgment as to Merck.

The third defendant, the City of Chicago, received a grant of federal assistance pursuant to the flu immunization program for the 1979–80 influenza season. The City also raises various defenses to support summary judgment in its favor. However, we need not explore all those issues in order to sustain summary judgment in behalf of the city.

First, the City questions the district court's jurisdiction over it as a "pendent-party," notwithstanding that the federal tort claim against the government arose out of a common nucleus of operative fact in which all the defendants are intertwined and out of which the plaintiff was allegedly injured. The City relies on the analysis and review of the prior cases of this circuit set forth in *Oakhill Cemetery of Hammond, Inc. v. Tri-State Bank*, 513 F.Supp. 885, 893–96 (N.D.Ill.1981). Some support for the City's argument is also found implicitly in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), in which the distinction is clearly made between permitting parties "already present in federal court by virtue of a case over which the court has jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction," and

> permitting a plaintiff who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to join an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction, simply because his claim against the first defendant and his claim against the second defendant "derive from a common nucleus of operative fact."

*Id.* at 14, 96 S.Ct. at 2420. *See also U.S. General, Inc. v. City of Joliet*, 598 F.2d 1050 (7th Cir.1979); *Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir.1973), *cert.*

*denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974).

However, as the plaintiff points out, neither *Aldinger,* nor the cases of this circuit cited in *Oakhill,* were brought under the FTCA which applies state tort law. In *Aldinger,* there is the suggestion that the prosecution of tort claims against the United States under 28 U.S.C. § 1346 might involve additional considerations. 427 U.S. at 18, 96 S.Ct. at 2422. The present case is jurisdictionally brought under section 1346.

The Court in *Aldinger* recognized that pendent-party jurisdiction is a "subtle and complex" question. 427 U.S. at 2, 96 S.Ct. at 2414. However, we do not believe it necessary for the purposes of this case to try to resolve that "subtle and complex" jurisdictional issue as it would not change the result reached even if we assume that there is jurisdiction.

Our prior discussion of the adequacy of the warning, which was the responsibility of the United States, and the actual production of the vaccine by Merck and its testing by the United States, is sufficient to also sustain summary judgment in behalf of the City. Plaintiff has even less of a case against the City than the other defendants. The plaintiff's claims concern the vaccine itself and the information disseminated about the risks; the plaintiff does not claim, for instance, that a city employee was negligent in actually administering the vaccine. The United States and Merck were the parties directly involved in the challenged aspects of the program. Neither is liable to plaintiff under any theory, nor can the City be. We find no aspect of the City's behavior in the program to justify further consideration under any theory of recovery.

Plaintiff has diligently endeavored to find a way around summary judgment, but mere argument cannot generate genuine issues of material fact when in the circumstances of a particular case there are none. Each party shall bear its own costs.

AFFIRMED AS TO ALL DEFENDANTS.